Filed 6/4/15  P. v. Ervin CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>BOBBY NARVELLE ERVIN,<br><br>　　　Defendant and Appellant. | B253649<br><br>(Los Angeles County<br>Super. Ct. No. TA129938) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed in part, reversed in part and remanded.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jonathan J. Kline and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Bobby Narvelle Ervin appeals from his conviction after jury trial of numerous domestic violence-related offenses committed during four separate incidents. Defendant challenges the trial court's admission of three 911 calls related to prior offenses and its admission of evidence of defendant's prior act of domestic violence committed over 10 years ago. Defendant also contends the court violated the bar on multiple punishment for a single act under Penal Code section 654 when it imposed consecutive sentences for his convictions for assault by means likely to produce great bodily injury and for corporal injury to a cohabitant, which arose from the same incident.[1] We reverse the judgment with respect to the consecutive sentences imposed for those convictions and remand to the trial court for resentencing consistent with our opinion. We otherwise affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I.      Procedural Background

An information charged defendant with 10 counts alleging offenses committed against his girlfriend, Helen Guzman (Guzman), during four separate incidents from August 2012 through July 2013. Defendant pleaded not guilty.

Following trial, the jury found defendant guilty of seven counts. The jury found defendant guilty on count 3, assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) for the August 2012 incident. It found defendant guilty on counts 5 and 6, which charged misdemeanor vandalism for incidents involving Guzman in January 2013 and March 2013 (§ 594, subd. (a)).[2] Finally, the jury found defendant guilty on count 1, assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), making criminal threats (§ 422, subd. (a)), count 7, dissuading a witness from

---

[1]      Except for section I of the Discussion, all further statutory references are to the Penal Code unless otherwise indicated.

[2]      The jury acquitted defendant of count 4, criminal threats (§ 422, subd. (a)) pertaining to the January 2013 incident. For the March 2013 incident, the jury acquitted defendant of count 8, dissuading a witness from reporting a crime (§136.1; subd. (b)(1)), and count 9, criminal threats (§ 422, subd. (a)).

reporting a crime (§136.1, subd. (b)(1)), and count 10, corporal injury to a cohabitant (§ 273.5, subd. (a);), all stemming from the July 2013 incident.

The court sentenced defendant to a total prison term of 10 years. The court selected count 10 as the principal count and imposed the upper term of four years. The court imposed subordinate consecutive terms of one year (one-third the midterm) for counts 1 and 3. The court imposed consecutive one-year terms on counts 5 and 6, and a two-year consecutive term (the midterm) for count 7. The court stayed the imposition of the eight-month sentence for count 2 pursuant to section 654 and gave defendant credit for 254 days in custody. The court also ordered defendant to pay various fines and fees. Defendant timely appealed.

## II.     Evidence at Trial

### A.     Testimony About the Four Incidents of Domestic Violence

Defendant and Guzman dated on and off for two years and intermittently lived together. At the time of trial, they were in a relationship, and Guzman did not want defendant to be prosecuted. Nonetheless, she testified about four incidents of domestic violence involving defendant. Responding police officers and defendant also testified about the events.

#### 1.     The August 2012 Incident

Guzman testified that while at home on the evening of August 16, 2012, she criticized defendant for "hanging out and drinking" while his visiting friend was within earshot. This upset defendant. He and Guzman argued, and defendant grabbed the front of Guzman's neck with one hand and applied pressure. Guzman started crying and tried to push him off. Defendant let go and left with his friend. Guzman called the police, and two officers responded. One of the responding officers testified that Guzman reported defendant "strangled" her with both hands. Guzman testified that she lied when she reported defendant had used two hands because she "wanted to incriminate him."

Defendant testified at trial. On cross-examination, he admitted grabbing Guzman's neck. However, he testified he only did so to stop Guzman from throwing a coffee cup at him.

3

### 2. *The January 2013 Incident*

Guzman testified that on the evening of January 16, 2013, she and defendant again argued about his "drinking and hanging out." Defendant threw his food at Guzman, and she asked him to leave her apartment. When defendant refused, Guzman grabbed a butcher knife, held it in a threatening manner, and again told him to leave. Defendant wrestled the knife away and said, "Bitch, I will kill you." Defendant then stabbed the stove, the toaster, and the couch, and left with the knife. Guzman thought defendant was drunk. She called 911. The prosecution played the call in which Guzman stated defendant "just threatened to kill me. He has a knife in his hand, and he threatened to kill me." One of the reporting officers testified that Guzman told him defendant stated, "Bitch, I could kill you," not "I will kill you."

Defendant admitted he threw the plate of food, but claimed he aimed it at the wall, not at Guzman. Defendant also admitted saying, "Bitch, I could just kill you right now," but insisted he did not mean it as a threat but to express frustration. Defendant testified he took the knife, said, "Let me show you what . . . these things do," and stabbed the couch, toaster, and stove.

### 3. *The March 2013 Incident*

Guzman testified that on the evening of March 29, 2013, defendant knocked on her apartment door. She opened the inner wooden door, but not the outer metal security door. Defendant demanded that Guzman open the security door, but she refused, told him to go away, and slammed the wooden door. Defendant then kicked the security door twice. Guzman saw that the bottom of the security door was detached from its frame and told defendant she was going to call the police. Defendant responded, "Call the police. I don't care. I'll find you before they find me." Guzman took the statement as a threat and claimed it made her "a little bit scared."

The prosecution played two 911 calls made by Guzman. During the first call, Guzman reported defendant had kicked her door and that "he just made a threat. He told me that . . . he was gonna find me before the police found him." After the police did not come, Guzman called 911 a second time and again reported that defendant threatened her

4

life.  One of the reporting officers testified Guzman stated defendant had kicked and broken the metal door but did not mention defendant's threat.

Defendant admitted he kicked and damaged the security door.  He denied threatening Guzman.

### 4. *The July 2013 Incident*

Guzman testified that on July 27, 2013, at about 11:00 p.m., defendant, who was "very drunk," woke her up and accused her of cheating on him.  Guzman told defendant to leave, but he refused.  Guzman then grabbed a curtain rod and tried to hit defendant with it.  Defendant wrestled the curtain rod away.  Guzman then grabbed a mop and hit defendant in the neck.  Defendant punched Guzman in her left eye with his closed fist and she fell.  As Guzman tried to rise, defendant grabbed her hair and dragged her down the wooden stairs.  At the bottom, defendant let go and left.  Guzman suffered a cut above her left eye and bruises on her left cheek, nostril, arm, and knee.  Guzman "panicked" because she could not stop the bleeding from her face and called 911.  Paramedics transported Guzman to the hospital, where she spent the night.  Doctors glued the cut above Guzman's eye shut, and at the time of trial—over four months later—her face still showed faint scarring.

The prosecution played Guzman's 911 call for the jury.  Later, Guzman stated that defendant was drunk and wouldn't leave her house.  Guzman reported that when she pushed defendant out of her room, defendant "socked" her in the face and dragged her down the stairs.  She said there was "blood everywhere."

One of the reporting officers testified that Guzman was crying, very scared, and said she did not feel safe at her residence.  Guzman told the officer that in addition to punching her in the face, grabbing her hair, and dragging her down the stairs, defendant also stated, "Bitch, don't even think of having me arrested.  I'll get out and kill you.  You aren't going anywhere."  During her testimony, Guzman denied that defendant made that threat.

Defendant testified that a couple of days before the July 2013 incident, Guzman hit him with a metal coat rack, but promised not to do it again.  On the night of the

5

incident, when Guzman picked up the same coat rack, defendant anticipated she would hit him, so he wrestled it away. As defendant tried to throw the coat rack down, Guzman hit him in the jaw, and he became disoriented. Defendant then grabbed Guzman's hair and tried to force her to the ground so she could not hit him. As they struggled, defendant slipped and they both fell down the stairs. Defendant testified he checked to make sure Guzman was "not really hurt" and left without saying anything. Defendant did not remember punching Guzman and did not see her bleeding.

The prosecution played a recorded jailhouse call in which defendant and Guzman discussed the July 2013 incident. During the call, defendant told Guzman he had been in a "jealous rage" during the fight. Defendant testified he had not actually felt that way and "was just making conversation" when he told Guzman otherwise.

### B. Evidence of Prior Acts of Domestic Violence

#### 1. The 1996 Prior Act

The prosecution called defendant's former girlfriend, Cassandra Bertrand (Bertrand) as a witness. She testified that she and defendant had a child together and were now good friends. Although Bertrand was dating the defendant in June 1996, she could not remember what happened on June 14, 1996 and did not recall talking to the police. Bertrand denied that defendant ever hit her, grabbed her hair, or caused her other injuries.

Detective Todd Ramsey (then a patrol officer) testified that he responded to Bertrand's residence on June 14, 1996, obtained a statement from her, and wrote a report. Because Detective Ramsey could not recall the details of his interview of Bertrand, the court allowed him to read a portion of his report into evidence. According to the report, Bertrand stated that her brother invited defendant into her residence at approximately 11:00 p.m. Bertrand and defendant began arguing, and when she told defendant to leave he grew angry and pulled her outside by her arm. Defendant "then grabbed [Bertrand] by her hair with his right hand, and struck her two times around her left eye area with his left fist," and fled. Detective Ramsey observed a three-inch scratch on the back of Bertrand's

6

neck, slight swelling around her left eye, and a broken fingernail. Bertrand refused medical treatment.

Defendant testified that nothing happened between him and Bertrand on June 14, 1996.[3]

### 2. The Three 911 Calls from Kathryn Washington

The prosecution planned to call defendant's former girlfriend, Kathryn Washington (Washington), to testify to prior acts of domestic violence defendant allegedly committed against her. When Washington failed to appear in court in violation of a court order, the prosecution instead sought the admission of three 911 calls made by Washington: two on the same day in April 2003 and one in October 2005.[4]

### a. The April 2003 Calls

The prosecution called Iris Dawson (Dawson), a 911 dispatcher for the Los Angeles Police Department, to testify. She stated she retrieved tapes of two 911 calls made by a caller named Kathryn Washington on April 19, 2003. Dawson did not participate in those calls and had no first-hand knowledge of the people or voices on those calls.

The prosecution played the two April 19 calls for the jury. During the first call at 1:50 a.m., the caller asked for police officers to be sent to her residence. The 911 operator asked what was going on and the caller responded that her boyfriend was "throwing all my stuff out [*sic*] the house. We both live here, and he just came in and he's tripping and he's throwing all my stuff out the door." After confirming the caller's name (as Washington) and phone number, the operator asked, "Are you afraid of him?" The caller responded that she was. The operator then asked for her boyfriend's name and

---

[3]     Defendant admitted that he suffered a conviction for battery of a domestic violence nature (§ 273.5) on April 2, 1997. However, no evidence unequivocally linked that conviction to the June 1996 incident against Bertrand.

[4]     The parties stipulated that Washington was the mother of one of defendant's children and that she had felony convictions for commercial burglary in 2008 and for possession of credit card information with intent to defraud in 2011.

description.  The caller identified him as Bobby Ervin.  The operator asked whether he was threatening her, and the caller responded, "Yes he is.  Don't you hear him?"  The operator indicated the police were on their way.

On cross-examination, defendant testified that before Washington made her first 911 call on April 19, he found her smoking PCP and told her to take her things and leave.  Washington refused, and defendant threw her things outside.  When Washington later returned, she became violent and tried to break a window with a footstool.  Defendant grabbed the footstool, and as he wrestled it from Washington, it hit her head.  Washington called 911.

During the second 911 call made at 12:20 p.m. on April 19, the caller stated she had called the previous night.  She then said, "Don't open the door please."  In the background, a male voice made inaudible statements.  When the 911 operator inquired about the problem, the caller responded, "Well I . . . my boyfriend [is] over here attacking me.  He just hit me in the head."  A male's voice stated, "Don't you lie.  (Inaudible.)  I'm going to shoot you for lying on me."  The operator confirmed the caller's name (Washington) and phone number, that her boyfriend's name was Bobby, and that he was wearing the same clothes as the previous night.  The operator asked whether he had any weapons in his hands, and the caller said he did not.  The operator stated she was sending the police.  The caller responded, "He just hit me with something though."  The operator then asked whether she needed paramedics, and the caller responded, "I think so."  The operator told her to hold for the paramedics.

Defendant testified he did not remember what happened but said it was not possible that he hit Washington in the head.  Defendant admitted hearing his voice in the background of the second April 19 call.  However, he denied hearing a voice threatening to shoot Washington.  He claimed he did not remember making such a threat.

The prosecution asked defendant whether he suffered a subsequent conviction for domestic battery violence (§ 273.5) on May 28, 2004, but he could not remember.  Defendant later admitted that he suffered a conviction for violence against Washington in 2004.

### b. *The October 2005 Call*

After tentatively sustaining defendant's foundational objection to the October 2005 call, the court allowed the prosecution to try to establish a foundation during the defendant's testimony. While cross-examining defendant, the prosecution played a 911 call made on October 11, 2005.[5] The caller stated, "I need you here fast." The 911 operator responded, "What's going on there ma'am?" The caller said, "My boyfriend just entered my house, and he threw all my stuff out the window and stuff. [¶] . . . [¶] He's tearing down my house right now." The call disconnected and the operator called back. The operator indicated the police were on their way and asked the caller if her boyfriend was still there. The caller responded, "No, but my hand is leaking. He cut my hand." The operator asked the caller if she needed the paramedics, and the caller responded, "Yes."

When asked whether he recognized Washington's voice from the recording, defendant responded, "I don't know if that was her." However, defendant testified he remembered the incident depicted in the call and confirmed it involved Washington. He stated, "I remember that incident when she said about her hand being cut," and "I remember the incident when she was saying, he throwing my clothes out the window, because I came home to get my clothes." Defendant testified he was never arrested for the incident but recalled speaking with police about it: "I remember that it was an officer around the neighborhood. . . . And when she called in for this--for this, say about a week later . . . [¶] --he had pulled up on me, and he--because he knows me, and he knows [Washington]. And he goes . . . 'Kathryn Washington said -- you know, put a report out on you. You know, you should go to the station and check that out. [¶] And I'm like, what kind of report? [¶] And he was, like, 'some kind of report with her hand. [¶] So I guess -- I went to the station, and they called [Washington], and I think it was -- she said I didn't do it, and it was over."

---

[5] Dawson, the 911 dispatcher for the Los Angeles Police Department, did not testify about this call.

9

## DISCUSSION

### I.     Admission of Defendant's 1996 Prior Act of Domestic Violence

Defendant contends the court abused its discretion by admitting evidence of defendant's prior act of domestic violence that was more than 10 years old, under Evidence Code section 1109, subdivision (e).[6] We review claims regarding the trial court's ruling on the admissibility of evidence under section 1109 for an abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 537 *(Johnson)*.) We find no abuse of discretion.

### A.     Legal Principles

Evidence Code section 1101, subdivision (a) establishes that character evidence generally is inadmissible to prove conduct on a specified occasion. However, section 1109, subdivision (a)(1) states, "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Subdivision (e) of section 1109 provides, "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." Thus, "evidence of past domestic violence is presumptively admissible under subdivision (a)(1)," while "subdivision (e) establishes the opposite presumption with respect to acts more than ten years past." (*Johnson*, *supra*, 185 Cal.App.4th at p. 537, footnote omitted.)

The Legislature has not addressed the nature of the subdivision (e) "interest of justice" inquiry, and courts apparently have had little opportunity to consider it. In *Johnson*, the leading case addressing subdivision (e), the court concluded that "'interest of justice'" is a more rigorous standard for admissibility than section 352 but calls for a

---

[6]     All statutory references in section I of the Discussion are to the Evidence Code unless otherwise indicated. Citations to subdivisions without reference to a code section are to the subdivisions of Evidence Code section 1109.

similar analysis.[7] (*Johnson*, 185 Cal.App.4th at p. 539.) Thus, as stated by the *Johnson* court, "[u]nder subdivision (a)(1) and section 352, evidence may be excluded only where its probative value is 'substantially outweighed' by its prejudicial effect. Though it reversed the presumption in subdivision (e), we believe the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales." (*Ibid.*) Subdivision (e) "clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*Johnson*, *supra*, 185 Cal.App.4th at p. 539.)

### B. The Court Did Not Abuse Its Discretion in Admitting Evidence of the 1996 Prior Act of Domestic Violence

The prosecution sought to admit evidence of defendant's 1996 prior act of domestic violence against Bertrand. In its trial brief and during argument, the prosecution argued defendant's 1996 prior act of domestic violence was admissible in the interest of justice under section 1109, subdivisions (a)(1) and (e). Defendant objected to evidence of the 1996 prior act because it was over 10 years old and its prejudicial effect outweighed its probative value.

After hearing argument, the court ruled that evidence of defendant's 1996 prior act of domestic violence was admissible. The court stated that, based on the prosecution's offer of proof, defendant had exhibited a pattern of domestic violence, and the 1996 prior act accordingly fell "within the spirit and within the parameters of the 1109 exception." Defendant contends the court abused its discretion "by failing to engage in a higher degree of scrutiny of balancing the factors of Evidence Code section 352," and failing to "make a finding that the admission of the remote incident was in the interest of justice." Defendant further contends that, even if the court conducted the proper analysis, it abused

---

[7] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

11

its discretion in admitting evidence of the 1996 prior act because its potential for prejudice far outweighed its probative value.  We disagree.

"'"[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function . . . ."'"  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285 [].)"  (*People v. Edwards* (2013) 57 Cal.4th 658, 724.)  Here, the record reveals the court clearly was aware of its duty to engage in a balancing analysis and to apply the higher interest of justice standard to the 1996 prior act.  The court repeatedly referred to the prosecution's trial brief, which correctly articulated the subdivision (e) standard.  Just before the court's ruling, defendant argued the prejudicial effect of the 1996 prior act outweighed its probative value, and the prosecution reiterated the interest of justice standard.  The court acknowledged that "the ten-year kind of mark . . . is something for the court to have to evaluate, based on the circumstances of each individual case."  In its ruling, the court stated the 1996 prior act was admissible despite its age in light of "the pattern that [defendant] has presumably established."  This record is sufficient to show that the court was aware of and applied the proper level of scrutiny.

Contrary to defendant's argument, the trial court was not required to make an explicit finding that admission of the evidence was in the interest of justice.  "A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."  (§ 402, subd. (c).)  Nothing in section 1109 requires an express interest of justice finding.

Finally, the court did not abuse its discretion in determining that admission of evidence of the 1996 prior act was in the interest of justice.  Section 1109 "reflects the legislative judgment that in domestic violence cases . . . similar prior offenses are 'uniquely probative' of guilt in a later accusation.  [Citation.]"  (*Johnson*, *supra*, 185 Cal.App.4th at p. 532.)  Thus, "'"[t]he principal factor affecting the probative value of an uncharged act is its similarity to the charged offense."'"  [Citation.]"  (*Id.* at pp. 531-532.)  Here, the similarities between the 1996 prior act and the July 2013 incident added to the probative value of the prior act.  In the 1996 prior act, defendant pulled Bertrand outside,

12

grabbed her by the hair, and punched her twice in the eye. In the July 2013 incident, defendant punched Guzman in the eye and then grabbed her hair and pulled her down the stairs. These incidents suggest a pattern of hair-pulling and eye-punching during domestic disputes. "[T]he Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior." (*Id.* at p. 533.)

Defendant contends the potential for undue prejudice from the 1996 prior act outweighed its probative value. He argues the 1996 prior act was far more inflammatory than the July 2013 incident because defendant allegedly hit Bertrand "a second time without apparent justification." First, we do not agree that defendant was justified in striking his victims. Second, the fact that defendant hit Bertrand an additional time in the 1996 incident does not by itself render that incident more inflammatory. In fact, Guzman's injuries were more serious than Bertrand's.

Defendant further contends the 1996 prior act tended to evoke an emotional bias against defendant by portraying him as a violent offender against women. However, the fact that damning inferences may be drawn from defendant's treatment of Bertrand does not make evidence of that incident prejudicial. "The word 'prejudicial' is not synonymous with 'damaging.' [Citation.] Rather, evidence is unduly prejudicial . . . only if it 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' [citation], or if it invites the jury to prejudge '"a person or cause on the basis of extraneous factors."' [Citation.]" (*Johnson*, *supra*, 185 Cal.App.4th at p. 534.) Here, while admission of the 1996 prior act certainly was damaging to defendant, its similarities to the July 2013 incident made it directly relevant and probative of defendant's conduct.

## II.    Admission of Washington's 911 Calls

Defendant contends the court abused its discretion and violated his Sixth Amendment right to confrontation by admitting into evidence the three 911 calls made by Washington. Defendant objected to the calls on hearsay, foundational, and confrontation clause grounds. After the court reviewed the transcript of the 911 calls and held a

13

hearing on their admissibility, it admitted the April 2003 calls into evidence, but tentatively sustained defendant's foundational objection to the October 2005 call. "We review the trial court's determination as to the admissibility of evidence . . . for abuse of discretion [citations] and the legal question whether admission of the evidence was constitutional de novo [citation]." (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553.) We find no abuse of discretion or error.

### A. The Court Did Not Abuse Its Discretion in Admitting the First April 2003 Call as a Spontaneous Statement

The court admitted the 911 calls over defendant's hearsay objection but did not state its rationale for doing so. Defendant contends the court abused its discretion by admitting Washington's first 911 call in April 2003 because it did not qualify as a spontaneous statement and was therefore inadmissible hearsay.[8] We disagree.

There is no dispute the 911 call was hearsay. However, a statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and "[w]as made spontaneously while the declarant was under the stress of excitement caused by" witnessing the event. (Evid. Code, § 1240.)

Defendant contends the spontaneous statement exception to the hearsay rule did not apply to the first April 2003 call because Washington's statements about her fear of defendant and his threats were not spontaneous but rather made in response to the 911 operator's suggestive questions. However, the fact that statements were elicited by questioning does not "'"deprive[] the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance." [Citation.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 496 (*Thomas*), italics omitted; see also *People v. Poggi* (1988) 45 Cal.3d 306, 319-320 [victim's identification of her attacker in response to police officer questioning 30 minutes after the incident held to be spontaneous].) Thus, this circumstance that Washington made statements in response to questioning is not dispositive.

---

[8] Defendant does not challenge the court's admission of the second April 2003 and October 2005 calls on hearsay grounds.

Here, Washington's dialogue with the 911 operator indicates she was in an excited state. Washington immediately asked that police to be sent to her residence. She described defendant's troubling conduct as ongoing—"he's throwing all my stuff out the door." The operator then asked simple questions to assess the danger: "Are you afraid of him?" and "Is he threatening you?" Washington responded affirmatively, and in reaction to the latter question added, "Don't you hear him?" "'[T]he discretion of the trial court is at its broadest' when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. [Citation.]" (*Thomas*, *supra*, 51 Cal.4th at p. 496.) The trial court did not abuse that discretion.

**B.    The Court Did Not Abuse Its Discretion in Finding the October 2005 Call Was Properly Authenticated**

Initially, the court tentatively sustained defendant's foundational objection to the October 2005 call because it lacked explicit references to Washington and defendant and thus was not self-authenticating.[9] However, after defendant testified, as summarized above, the court admitted the October 2005 call into evidence. Defendant contends the court abused its discretion because the call was not properly authenticated. We disagree.

"Audio recordings are writings as defined by the Evidence Code. (Evid. Code, § 250.)" (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1002 (*Dawkins*).) To be admissible in evidence, a writing must be authenticated. (Evid. Code, § 1401.) "Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law.' ([Evid. Code,] § 1400.)" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) "Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn

---

[9]    The court overruled defendant's foundational objections to the April 2003 calls, finding they were self-authenticated by references to defendant, Washington, and Washington's address. Defendant does not challenge these rulings on appeal.

regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Id.* at p. 267.)

"An audio recording is typically authenticated by showing it is a reasonable representation of that which it is alleged to portray. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 952 [].) Typically, a party to the conversation recorded is called to testify to the audio recording's accuracy. However, the foundation . . . may be supplied by other witness testimony, circumstantial evidence, content and location, or any other means provided by law, including statutory presumption. (*Goldsmith, supra,* 59 Cal.4th at p. 268 [].)" (*Dawkins*, *supra*, 230 Cal.App.4th at p. 1002.)

Defendant contends the prosecution failed to properly authenticate the October 2005 call because it lacked self-authenticating evidence, there was no evidence of a phone number or address associated with the call, and defendant did not recognize the voice in the recording. While any of these might have been sufficient to authenticate the call, none was necessary. Here, defendant's testimony authenticated the October 2005 call.

After listening to the recording of the call, defendant clearly recalled the events it depicted. He remembered the incident and that it involved Washington. More significantly, defendant specifically remembered the two most identifiable features of the call: that Washington cut her hand and that she said, "He throwing my clothes out the window [*sic*]." Defendant further remembered being confronted by a police officer about the incident and voluntarily going to the police station to discuss it.

Defendant's testimony established a prima facie case that the recording was of Washington's 911 call and that the call pertained to defendant. This was sufficient to authenticate the call. (See *Goldsmith*, *supra*, 59 Cal.4th at p. 266.) Accordingly, the court did not abuse its discretion in admitting the October 2005 call into evidence.

**C.      The Court Did Not Err in Ruling that the 911 Calls Did Not Violate the Confrontation Clause**

Defendant contends the admission of Washington's 911 calls violated the Sixth Amendment confrontation clause and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  We find no error.

The Sixth Amendment's confrontation clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In *Thomas*, the California Supreme Court summarized the holding of *Crawford*:  "admission of a 'testimonial' out-of-court statement violates the confrontation clause unless the defendant had a prior opportunity to cross-examine the declarant." (*Thomas*, *supra*, 51 Cal.4th at p. 496.)  Because Washington's 911 calls were obviously out-of-court statements and defendant had not had an opportunity to cross-examine her, we address whether Washington's 911 calls were testimonial.

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)  "The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight.  If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause."  (*Michigan v. Bryant* (2011) 562 U.S. 344, ___ [131 S.Ct. 1143, 1157 fn. 8 ] (*Bryant*).)

"A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prove[e]' some past fact, but to describe current circumstances requiring police assistance."  (*Davis*, *supra*, 547 U.S. at p. 827.)  In other words, the initial interrogation in a 911 call rarely is testimonial.

In *Davis*, the court held a 911 call to be nontestimonial where the caller "was speaking about events as *they were actually happening*," "was facing an ongoing emergency," and was providing answers "over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*, original italics.) Further, "the elicited statements were necessary to be able to *resolve* the present emergency," . . . [t]hat is true even of the operator's efforts to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." (*Ibid.*)

All of these circumstances are present in Washington's 911 calls. As the trial court found, the calls indicated an "ongoing threat" and were "certainly in the moment"; the operators' questions were not "sit-down type interview" questions, but rather were aimed at addressing "the issue that is happening at that point."

Specifically, in the first April 2003 call, Washington described the incident as it was happening. She faced an ongoing emergency in which she had been threatened, was afraid, and was not in an objectively safe environment. Further, the operator's questions—including those about Washington's and defendant's past problems and prior police responses—were designed to resolve the emergency and assess the threat. As in *Davis*, questions about defendant's identity and description were aimed at obtaining information to aid responding officers.

In the second April 2003 call, Washington also described an ongoing emergency as it was happening. She stated defendant was attacking her and had just hit her in the head. Defendant could be heard in the background threatening to shoot Washington. At the end of the call, Washington requested medical treatment.

In the October 2005 call, Washington's statements again indicated an ongoing emergency. She stated she needed the police there "fast" and described a chaotic situation in which defendant was throwing things out the window and "tearing down [her] house." She was not merely lodging a complaint about defendant's treatment of her property. After the call disconnected and the 911 operator called back, Washington

18

reported defendant had left, but stated that defendant cut her hand and that it was "leaking."[10]

We conclude that the circumstances of Washington's interrogations "objectively indicate their primary purpose was to enable police assistance to meet an ongoing emergency. [Washington] simply was not acting as a *witness*; she was not *testifying*." (*Davis*, *supra*, 547 U.S. at p. 828.) Accordingly, the 911 calls were nontestimonial and their admission into evidence did not violate the confrontation clause. This conclusion is consistent with *People v. Johnson* (2010) 189 Cal.App.4th 1216, 1225-26, *People v. Byron* (2009) 170 Cal.App.4th 657, 675, and *People v. Brenn* (2007) 152 Cal.App.4th 166, 176,[11] which found 911 calls in similar circumstances to be nontestimonial.[12]

## III. Unauthorized Sentence in Violation of Section 654

Defendant contends the court erred in imposing consecutive sentences for his convictions under count 1 (assault by means likely to produce great bodily injury, § 245, subd. (a)(4)) and count 10 (corporal injury to a cohabitant, § 273.5, subd. (a)), for the July 2013 incident. He argues that section 654 prohibited the imposition of a consecutive

---

[10] The 911 calls are also admissible under the principles enumerated in *People v. Cage* (2007) 40 Cal.4th 965, 984, in which the California Supreme Court applied *Davis*. One of those principles is that "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Ibid.*)

[11] Defendant attempts to distinguish these three cases, contending that here, officers did not testify at trial to corroborate Washington's mental state, physical or medical condition, or any other circumstances that would establish an ongoing emergency. However, the existence of an ongoing emergency must be objectively assessed from the point of view of the parties to the call at the time. (*Bryant*, *supra*, 131 S.Ct. at p. 1158, fn. 8.) Corroborating testimony is not necessary for this assessment, and defendant provides no authority to suggest otherwise.

[12] Defendant contends that the court's combination of erroneous rulings regarding the admission of prior acts of domestic violence deprived defendant of due process under the Fourteenth Amendment of the United States Constitution. Because we conclude the court did not abuse its discretion in admitting any of this evidence, we need not address defendant's due process argument.

19

sentence for count 1 because the conduct underlying both counts occurred during a single course of conduct with the same principal objective. We agree and therefore reverse with respect to the consecutive sentence imposed on count 1.

### A.    Legal Principles

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This seemingly simple statute has generated decades of case law regarding the precise parameters of an "act" that triggers section 654's bar on multiple punishment. The primary test to determine whether conduct constituted an "act" for the purposes of section 654 was set forth in *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334. In *Neal*, the California Supreme Court held that an "act" for the purposes of section 654 was not limited to a "single physical act," but could include a "course of conduct." (*Neal*, *supra*, 55 Cal.2d at p.19.) The test of "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Ibid*.) While *Neal's* "intent and objective" test and reasoning has been criticized and limited, its basic tenet has never been overruled. (See, e.g., *People v. Latimer* (1993) 5 Cal.4th 1203, 1205-1206 [criticizing *Neal* but declining to overrule it].)[13]

"'We review under the substantial-evidence standard the court's factual finding, implicit or explicit, of whether there was a single criminal act or a course of conduct with

---

[13]    Recently the California Supreme Court held that section 654 applied to bar multiple punishment for three crimes arising from a "single physical act." (*People v. Jones* (2012) 54 Cal. 4th 350, 358.) Neither party contends the *Jones* "single act" standard is relevant to defendant's course of conduct here, and we decline to address it.

a single criminal objective.' [Citation.]" (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1296; see also *People v. Saffle* (1992) 4 Cal.App.4th 434, 438.)

**B.    Defendant's Sentence Violated Section 654**

Defendant contends the sentence for count 1 (assault by means likely to produce great bodily injury, § 245, subd. (a)(4)) imposes punishment for the same underlying course of conduct punished in count 10 (corporal injury to a cohabitant, § 273.5, subd. (a)). Both sentences pertain to the July 2013 incident in which defendant punched Guzman in the eye, grabbed her hair, and dragged her down the stairs. Although the trial court was silent on the matter, by imposing multiple sentences the court implicitly found that defendant had separate objectives during this conduct. (See *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603-1604.)

Guzman's testimony indicates defendant dragged her down the stairs by the hair immediately after punching her. Although temporal proximity alone is insufficient to render a course of conduct indivisible (*People v. Harrison* (1989) 48 Cal.3d 321, 335), nothing in the record indicates defendant had anything but a single intent and objective throughout the assault: to inflict pain and injury on Guzman. Therefore, defendant's assault constitutes a single course of conduct, and he may not be punished for more than one offense related to that conduct. (See *Neal*, *supra*, 55 Cal.2d at p.19.)

Our decision is informed by *People v. Phong Bui* (2011) 192 Cal.App.4th 1002. There, the court concluded the defendant could not be punished for both attempted murder and mayhem because the three gunshots defendant fired within seconds of each other formed one transaction. (*Id.* at p. 1015.) Because "[t]here was no evidence [the] defendant had independent objectives for the two crimes that would justify multiple punishment," the court held that the lesser mayhem sentence should have been stayed. (*Ibid.*) The same is true here. There is nothing in the record suggesting defendant developed a distinct criminal objective during the seconds between his punch and grabbing Guzman's hair. On this record, the trial court should have stayed defendant's one-year sentence for count 1. (See also *People v. Pitts* (1990) 223 Cal.App.3d 1547,

21

1560 [where convictions of mayhem and assault were based on one attack on one victim, sentence for lesser offense must be stayed under section 654].)

## DISPOSITION

The judgment is reversed insofar as it imposes and executes a consecutive sentence with respect to count 1. The case is remanded to the trial court to stay the sentence on count 1 consistent with this opinion. The judgment is otherwise affirmed. The clerk of the superior court is instructed to prepare an amended abstract of judgment reflecting these changes and serve a copy on the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

22