Filed 10/20/14; pub. order 10/21/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245611 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084616) |
| v. | |
| RODNEY LASHAWN DAWKINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge. Affirmed.

Akin Gump Strauss Hauer & Feld and Katherine J. Galston, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Chung Mar and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

Rodney Lawshawn Dawkins appeals from the judgment after a jury trial in which he was convicted of first degree burglary. (Pen. Code, § 459.) After the jury returned its verdict, appellant admitted he had a prior serious felony conviction that also constituted a strike within the meaning of the Three Strikes law (Pen. Code, §§ 667, subds. (a)-(i), 1170.12, subds. (a)-(d)) and he had served a prior separate prison term for a felony (Pen. Code, § 667.5, subd. (b)).

At sentencing, the trial court denied appellant's motion pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 to sentence him as if he had no prior strike conviction. It sentenced him to an aggregate term in state prison of 14 years, consisting of a doubled middle term of four years, or eight years, enhanced by five years for the prior serious felony conviction and by one year for having served a prior separate prison term.[1]

## CONTENTION

Appellant contends the audio recording of the 9-1-1 call was inadmissible in evidence as it was not properly authenticated.

## BACKGROUND

1. *The trial evidence.*

We view the evidence in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

a. *The deputies' and victim's trial testimony.*

On June 15, 2012, Olivia Flores lived with her husband and children in an upstairs apartment, No. 7, at 1020 108th Street in Los Angeles County. At about 2:00 p.m. that

---

[1] The jury returned its verdict on October 10, 2012, and appellant was sentenced on October 31, 2012. While the notice of appeal was timely filed within 60 days following the entry of the October 31, 2012, judgment, the text in the notice of appeal claims the appeal is from the "judgment rendered on October 10, 2012 . . . ." No appeal lies from the verdict. (*In re Gray* (2009) 179 Cal.App.4th 1189, 1195-1196.) However, appellant's intent appears to be clear. Consequently, we deem this appeal to be from the judgment entered on October 31, 2012. (*Ibid.*; *People v. Richards* (1969) 269 Cal.App.2d 768, 769, fn. 1; see also *Marcotte v. Municipal Court* (1976) 64 Cal.App.3d 235, 239.)

2

day, she locked her apartment and left home to go to the laundromat. She gave no one permission to break open the only door to her apartment, an interior front wooden door and an exterior security screen. Shortly after 5:00 p.m., Flores's sister, another resident of the same apartment complex, telephoned Flores and instructed her to return home. Flores did so.

In the meantime, at about 5:00 p.m., an anonymous caller telephoned the local 9-1-1 operator to report a burglary in progress at the apartment house next door and to the west of her 1028 108th Street residence. Los Angeles County Deputy Sheriffs Zuniga and Dan Ramirez (Deputy Ramirez), who were in uniform, responded immediately and during the 9-1-1 call in their marked police vehicle. As the deputies approached the apartment complex, they had their flashing multi-colored lights on and their siren was operating.

Deputy Ramirez testified the complex in question was a two-story apartment building. The apartment doors all faced one way. Apartment No. 7 was on the second floor. The one outside hallway for gaining access to the second floor apartments had a staircase at each end, front and rear, and the staircases were the exclusive means for reaching the second floor apartments. The deputies entered the complex using the front staircase. They found Flores's doors ajar and damage to the wooden door indicating there may have been a forced entry. There was no one inside the apartment. The deputies returned curbside, again departing from the second floor by using the front staircase. Residents started emerging from their apartments to see what was going on.

The deputies canvassed the area, looking for the anonymous 9-1-1 caller. Flores approached the deputies and identified herself as the occupant of apartment No. 7. According to Deputy Ramirez, at the same time, appellant walked out to the sidewalk from the area alongside the apartment complex and inside the fencing surrounding the complex. His demeanor was nonchalant.

Deputy Ramirez testified that the complex had a rear yard, but the only reasonable access to the rear of the complex is the walkway that runs to the back of the complex. The complex's rear yard is surrounded by tall fencing, most of which is topped with

3

barbed wire, making an escape out the rear of the complex through its rear yard at best difficult. The front of the complex is also gated.

Appellant was wearing dark jeans and a gray shirt. He was about 40 years old and matched the description of the suspect described to them by the 9-1-1 operator. In his right hand, appellant was carrying a black duffel bag.

As appellant walked out of the rear yard, Flores spontaneously identified the black duffel bag in appellant's hand as hers. Appellant was detained, and the deputies opened the duffel bag. Flores identified its contents as belonging to her. Inside the duffel bag were about ten items of miscellaneous women's clothing, two electronic handheld gaming sticks and a framed photograph of a graduation certificate for Flores's daughter. There were no other African American men in the area of the apartment complex.

The deputies arrested appellant. They advised him of his *Miranda* rights, and he waived those rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) When asked whether appellant had entered apartment No. 7, he claimed he had done so to get a few things. He added, "Who gives a sh-- if I push the door open; the lady knows me." Flores denied knowing or ever having seen appellant previously.

The deputies knocked on a few doors again in an attempt to find the anonymous 9-1-1 caller but were unsuccessful.

Appellant's booking photograph, which was taken in the clothing he was wearing when arrested, was displayed to the jury. The photograph depicted him wearing a gray shirt and blue jeans. Appellant claimed his residence was located on 107th Street.

At trial, photographs of the complex and surrounding buildings, the fencing around the yard, and the front door were shown to the jury. Deputy Ramirez opined the photographs of Flores's front doors appeared to indicate that her front doors were forced open by use of a burglary tool.

Several hours after deputies had departed, Flores telephoned the sheriff's station. She reported she had found a crowbar lying on the floor of her bedroom. Deputy Ramirez opined the marks on Flores's front door were consistent with the use of that crowbar.

4

Deputy Ramirez testified Flores's identification of her duffel bag was spontaneous as soon as Flores saw it in appellant's hand. In Flores's testimony, she said appellant was already inside the police car and the duffel bag was sitting on the police vehicle when she saw it and identified it as hers.

b. *The anonymous 9-1-1 call.*

At trial, the prosecution played a computer disk (CD) for the jury. It contained an audio recording of a 9-1-1 telephone call received by a sheriff's department operator at 4:45 p.m. on June 15, 2012. The call was made by a female who refused to identify herself. The caller told the operator that she was observing a suspicious man who was trying to break into an apartment in the building next door. The burglar had a knife. Then the caller reported the burglar had actually entered the apartment and had achieved entry during the last two minutes. The operator inquired about the address of the building the caller was describing, but the caller was unsure. She told the operator her address was 1028 West 108th Street. The apartment complex she was referring to was on 108th Street. It was a yellow-colored apartment complex. The particular apartment being burglarized was on its second floor. She could see the male burglar using a knife on the door then kicking the door open. The caller could not presently see the burglar. However, the burglar was an African American man wearing a gray shirt. He had a knife and a tool. The tool may have been a large kitchen knife.

At that point, the 9-1-1 operator asked the caller to stay on the line while the operator told another party the informant was calling from 1028 108th Street. The dispatcher/ 9-1-1 operator said the 9-1-1 caller had observed an ongoing burglary in apartment No. 7 of the yellow apartment complex to the west of her residence. The burglar was a "male, black, 30-40 years old, wearing gray clothing." The caller, who apparently could overhear the operator's conversation with the deputy, corrected the operator, telling the operator she had seen a person wearing light gray and "also blue jeans . . . I'm not sure."

5

The 9-1-1 caller then told the operator, she had just observed the burglar leaving apartment No. 7 with a "black bag." She could also see the lights of the arriving police vehicle.

The 9-1-1 caller indicated she was located in the rear house on the property next door to the apartment complex in question. The burglarized unit was to her west on the second floor, and the apartment complex was yellow in color.

The operator at that point was apparently speaking to a deputy sheriff who had arrived at the scene. The operator advised the deputy at the scene the 9-1-1 caller had observed the burglar enter the apartment. The operator told the caller the deputies had arrived and were entering the complex. The caller told the operator the burglar was already outside. At this juncture, the caller apparently could not see the burglar's location. She was inside her residence and did not want to go outside. The caller said she could presently see the deputies checking the apartment building.

The operator told the deputies the caller did not want to be contacted.

2. *The proceedings and testimony relevant to authenticating the audio recording.*

   a. *The Evidence Code section 402 hearing.*

Before trial, the prosecutor raised the issue of the admissibility of the contents of an audio recording of the 9-1-1 call. The prosecutor anticipated defense objections of hearsay and a denial of confrontation. The trial court found the audio recording fell within the business record exception to the hearsay rule. It ruled there was no issue with confrontation, and the statements by the anonymous caller on the audio recording were contemporaneous statements or excited utterances, which were admissible as exceptions to the hearsay rule.

Trial counsel objected to using the sheriff's investigator, Ismael Jimenez (Deputy Jimenez), to authenticate the call, in lieu of using a party to the conversation or a custodian of the audio recording. Trial counsel suggested the prosecutor was required to call another person, perhaps the station's IT technician, to authenticate the recording.

At the section 402 hearing, the prosecutor called Deputy Jimenez as his witness. Deputy Jimenez testified the police station has an automated system called the voice print

6

system. That system automatically and contemporaneously records all telephone calls coming in and going out of the sheriff's station. The 9-1-1 calls to the sheriff's department operator or dispatcher are also recorded in real time on the same system.

Deputy Jimenez was a 15-year veteran Los Angeles County Deputy Sheriff. For the previous two and a half years, he had been assigned as a detective. During this time, he had been using the voice print system several times a week. He was not trained on the system by an IT technician. He was trained by a training deputy or detective, who taught him how to download recordings from the voice print system for use in his investigative work. Deputy Jimenez explained that all calls to and from the station were recorded, and the recordings were given a time stamp and date. The recordings of the calls remain in the system for several months. Thereafter, the station IT technicians download the calls onto CD Rom disks, and the CD Rom disks are filed by the station's IT personnel.

In this case, as part of his duties, Deputy Jimenez used his desktop computer to access the voice print system. He used his password to access the program. Thereafter, he entered the date and time of the telephone call. He found several calls at the approximate time the telephone call was made. Only one was the 9-1-1 call to the dispatch operator related to the instant burglary. The remainder of the calls he retrieved were the "traffic between the units regarding the call." He listened to the 9-1-1 call made in the proper time frame for the burglary. It appeared to be the telephone call he was looking for. It had been preserved with its time and date. The content of the entire audio recording conformed to what the deputy knew about the instant burglary.

During cross-examination, Deputy Jimenez acknowledged he is not the person who maintains or fixes the voice print system. The deputy never discussed the telephone call with the 9-1-1 operator who had received the call, although in other cases that is something he might do. The deputy said the voice print system is a computer software program, just like other software programs. If he has difficulty locating a particular call, he seeks the assistance of the station IT personnel. When questioned about the accuracy of the time stamps on the recordings, he said the time stamp should be accurate as each call is recorded in real time. The deputy indicated the training necessary to competently

7

access the program was not intensive, and he and the other deputies who function as investigators use the voice print system constantly. Deputy Jimenez identified the IT supervisor at his sheriff's station for trial counsel.

The deputy had reviewed the transcript of the 9-1-1 call recording, Exhibit B, prepared by the prosecution of the contents of the 9-1-1 telephone call. The prosecutor said the transcript bore a date indicating the telephone call contained therein was made on June 15, 2012, the date of the instant burglary. The prosecutor inquired whether the content of the call referred to an address. The deputy replied the anonymous caller indicated her address was 1028 West 108th Street. The deputy said his review of the contents of the recording indicated that the 9-1-1 caller was telephoning about a burglary and indicated the burglary took place at 1020 West 108th Street, apartment No. 7, in the County of Los Angeles. The deputy prepared a CD of the entire call and gave it to the office of the district attorney. The transcript he had before him accurately reflected the content of the recorded 9-1-1 telephone call.[2]

The deputy testified the anonymous caller identified herself at one point during the call as "Anna." The deputy attempted to locate Anna at 1028 West 108th Street, the address she claimed was hers. However, he was unable to do so. The deputy said the transcript accurately reflected the content of the conversation between the parties on the call.

b. *The trial court's initial ruling on admissibility.*

After the parties and the trial court had listened to Deputy Jimenez's testimony, trial counsel argued that the deputy did not have the requisite expertise to lay a proper foundation for authenticating the audio recording. All the deputy had done was retrieve a copy of the telephone call from a computer software program. The deputy was unaware of how the system itself was maintained, and he was not qualified to repair or maintain the system -- the station IT personnel have that responsibility. Trial counsel questioned

---

[2]    The record indicates the 9-1-1 call was played to the jury with redactions, and the transcript of the call would have been similarly redacted.

why the dispatch operator, who was a party to the telephone call, was unavailable to authenticate the call. Counsel questioned the accuracy of the time date and stamp. He argued no one simply listening to the deputy's testimony was in a position to say whether on retrieval what was downloaded to the deputy's computer system was accurate.

The prosecutor urged the record is maintained in the custody of a public entity and the deputy had attested the recording was a true and correct copy of what was contained in the voice print system. The content of the recording itself demonstrated what was in court was the recording of the 9-1-1 call with respect to the burglary at 1020 West 108th Street, apartment No. 7. The prosecutor claimed establishing the record is maintained by a public entity provides a sufficient foundation for the record to be admitted into evidence.

The trial court ruled a sufficient foundation had been established for the admission of the audio recording of the 9-1-1 call, marked as Exhibit A, and the transcript of that call, Exhibit B. The trial court commented in pertinent part the deputy had been trained on the system in the course of his training as a detective. He used the system frequently. The deputy explained how the telephone calls for the station were all recorded in "realtime." To access the recording, the deputy had entered the date and the time of the incident into the computer program. The address recited in the recording matched the address pertinent to this case.

The trial court made the further observation the prosecutor had demonstrated the recording is a business record made in the regular use of the 9-1-1 call system maintained by this particular sheriff's station. The context of the call shows it was made to a local 9-1-1 operator. The deputy was qualified as a witness to testify to the manner of the call's collection, and he was properly trained to retrieve such telephone calls over the voice print system. The deputy had used proper procedures to obtain the recording of the call. The recording here appeared to pertain to the burglary before the trial court.

c. *The trial testimony.*

Deputy Jimenez testified at trial as to the foundation for the 9-1-1 call in the same terms as he had testified pretrial at the Evidence Code section 402 hearing. He added that

the recording was related to the instant burglary that had occurred at 4:55 p.m. on June 15, 2012. The 9-1-1 caller was reporting a burglary in progress at 1020 108th Street, apartment No. 7.

The prosecutor had Deputy Jimenez look at photographs of the various apartment buildings and structures surrounding the apartment complex located at 1020 108th Street. The deputy testified the burglarized premises, apartment No. 7, was located at 1020 West 108th Street. There was a residence next to it to the west. From the photographs of the burglary scene, it was apparent that while the 9-1-1 caller claimed the apartment burglarized was to her west, in fact, an apartment building was to the east of the apartment complex in question. However, there was a residence to the west of the apartment complex.

On the recording, the 9-1-1 caller had identified her address as 1028 108th Street. After examining the photographs of the structures surrounding the apartment complex, the deputy had concluded the anonymous caller was mistaken, or deliberately misrepresented her location, when she told the operator she could see the burglarized apartment next door to the west. The burglarized apartment was actually to the east of the only residence next door to the complex.

The deputy said he had gone to the residence next to the apartment complex looking for the anonymous caller. He could not enter the residence's yard as there were three large dogs inside the yard. No one appeared to be home. He returned several days later. A woman emerged from the residence. She refused to identify herself and denied she was present when the burglary occurred. He gave her his business card and asked her to give it to the person who made the telephone call and have the person call him. No one contacted him concerning the 9-1-1 call.

## DISCUSSION

Appellant contends he is entitled to a reversal of the judgment as the audio recording was improperly admitted into evidence and admitting the audio recording into evidence constitutes prejudicial error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

We disagree.

10

1. *The relevant legal authority.*

This court reviews claims regarding a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).)

Audio recordings are writings as defined by the Evidence Code. (Evid. Code, § 250.)**³** "To be admissible in evidence, a writing must be relevant and authenticated. (§§ 350, 1401.) The proffered evidence must be an original writing or otherwise admissible secondary evidence of the writing's content. (§§ 1520, 1521.) It must not be subject to any exclusionary rule. (See, e.g., § 1200.)" (*Goldsmith, supra*, 59 Cal.4th at p. 266.)

Here, we are concerned only with the trial court's ruling on admissibility as to authenticating the audio recording. That ruling is made as a "preliminary fact (§ 403, subd. (a)(3)) and is statutorily defined as the 'introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' (§ 1400.)" (*Goldsmith, supra*, 59 Cal.4th at p. 266.) The statutory definition ties authentication to relevance: " '[b]efore any tangible object may be admitted into evidence, the party seeking to introduce the object must make a preliminary showing that the object is in some way relevant to the issues to be decided in the action. When the object sought to be introduced is a writing, this preliminary showing of relevancy usually entails some proof that the writing is authentic—i.e., that the writing was made or signed by its purported maker.' " (*Ibid*.)

Other items of writing, such as audio recordings, must also be shown to be what they purport to be, "i.e., that [they] are genuine for the purposes offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting

---

**³**     All further statutory references are to the Evidence Code unless otherwise designated.

11

inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)" (*Goldsmith, supra,* 59 Cal.4th at p. 267.)

An audio recording is typically authenticated by showing it is a reasonable representation of that which it is alleged to portray. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 952.) Typically, a party to the conversation recorded is called to testify to the audio recording's accuracy. However, the foundation may, but need not be supplied by the person witnessing the event being recorded. It may be supplied by other witness testimony, circumstantial evidence, content and location, or any other means provided by law, including statutory presumption. (*Goldsmith, supra*, 59 Cal.4th at p. 268.)

b. *The analysis*.

To be clear, appellant is concerned here only with issues of the proper authentication of the audio recording. He is not challenging the trial court's rulings on the audio recording's admissibility under the rules concerning hearsay, except insofar as the trial court may have conflated the foundation for the admission of a business record (§ 1271) with the requirements for authenticating a document.

The trial court did not abuse its discretion in making its section 403 determination the audio recording was properly admitted into evidence. It is settled computer systems that automatically record data in real time, especially on government-maintained computers, are presumed to be accurate. Thus, a witness with the general knowledge of an automated system may testify to his or her use of the system and that he has downloaded the computer information to produce the recording. No elaborate showing of the accuracy of the recorded data is required. Courts in California have not required "testimony regarding the ' "acceptability, accuracy, maintenance, and reliability of … computer hardware and software" ' in similar situations. (*People v. Martinez* (2000) 22 Cal.4th 106, 132, quoting *People v. Lugashi* (1988) 205 Cal App.3d 632, 642 [CLETS printout]; accord, *People v. Nazary* (2010) 191 Cal.App.4th 727, 755.)" (*Goldsmith, supra*, 59 Cal.4th at p. 272 [automated traffic enforcement system].)

12

The rationale is that while mistakes may occur, such matters may be developed on cross-examination and should not affect the admissibility of the printout or recording of the data itself. (*People v. Martinez, supra*, 22 Cal.4th at p. 132; see also *United States v. Catabran* (9th Cir. 1988) 836 F.2d 453, 458 [questions as to the accuracy of computer printouts, whether resulting from incorrect data or the operation of the computer program, as with inaccuracies in other type of business records, affect only the weight of the printouts, not admissibility]; *Hutchinson v. State* (Tex.Ct.App. 1982) 642 S.W.2d 537, 538 [whether the computer was functioning properly on the date of the printout and had been tested and working properly before that date are questions affecting weight, not admissibility].)

In this case, Deputy Jimenez's testimony was sufficient to establish the results he obtained from inputting the appropriate time and date from the voice print system was an accurate printout or recording of the data contained in the system. Further, he testified that he had listened to all the recordings in the system within the appropriate time frame. What he copied onto the CD was the only 9-1-1 call in the appropriate time frame. He had listened to the entire call. The content of the call itself conformed to the information he was aware of concerning the burglary. Thus, the content of the call itself provided further evidence that what he had downloaded was a full and accurate version of the 9-1-1 call in question.

This court is not concerned that there were one or two factual inconsistencies between the 9-1-1 caller's claims and the actual facts concerning the layout of the area where the burglary occurred. These discrepancies are explained as mistake or by the caller's desire to remain anonymous. It was up to the jury to decide whether the discrepancies required them to disregard the information given to the 9-1-1 operator by the anonymous caller.

Appellant complains the trial court erred by conflating issues of the foundation for the business record exception to the hearsay rule (§ 1271) with the requirements for authentication. The analysis in the recent decision in *Goldsmith* makes it apparent the issues of hearsay and authentication are independent of one another. (See also *Stockinger*

13

*v. Feather River Cmty. Coll*. (2003) 111 Cal.App.4th 1014, 1028.) *Goldsmith* also held the output of automatically recorded computer programs is not hearsay. Printouts from such computer programs are not "statements of a person" within the meaning of section 1200, and thus, the computer's output is not hearsay. (*Goldsmith, supra*, 59 Cal.4th at pp. 273-274.)

Our trial court made a two-level analysis. In response to the prosecution's motion, it found the content of the anonymous caller's statements were admissible in evidence as exceptions to the hearsay rule as the statements were contemporaneous or excited utterances. It further commented there was no issue of the denial of confrontation. It apparently believed it needed to make a further finding the computer information was a business record to overcome any objection there was a second level of hearsay. But the *Goldsmith* decision makes it evident there is no valid hearsay objection to the data from an automated computer recording.

A "ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion. [¶] . . . [¶] In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter." (*Davey v. Southern Pacific Co*. (1897) 116 Cal. 325, 329-330.)

Deputy Jimenez's testimony generally about the computer system's operation and his downloading of computer data was sufficient, in combination with the content of the recording, to establish the recording was genuine and what the prosecution claimed it was. The trial court properly exercised its discretion by admitting the audio recording into evidence.

14

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        KLEIN, P. J.

We concur:



        KITCHING, J.



        EDMON, J.*

---

Filed 10/21/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | B245611 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084616) |
| v. | |
| RODNEY LASHAWN DAWKINS, | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |


THE COURT:

The opinion in the above entitled matter filed October 20, 2014, filed as a non-published opinion, is modified as follows: opinion to be published.

No change in judgment.