Filed 4/18/16  P. v. Gamez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067494 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF32158) |
| FAUSTO FERNANDO GAMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, L. Brooks Anderholt, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland, Deputy Attorney General, for Plaintiff and Respondent.

Following a trial in which identity was the principal disputed issue, a jury found Fausto Fernando Gamez guilty of conspiracy (Pen. Code, § 182) to commit the following

four crimes: (1) possession of heroin for sale (Health & Saf. Code, § 11351); (2) transportation of heroin (Health & Saf. Code, § 11352); (3) possession of methamphetamine for sale (Health & Saf. Code, § 11378); and (4) transportation of methamphetamine for sale (Health & Saf. Code, § 11379). The jury found to be true allegations that the methamphetamine and heroin each weighed more than one kilogram (Health & Saf. Code, § 11370, subd. (a)(1)). The trial court sentenced Gamez to an aggregate prison term of seven years.

On appeal Gamez challenges his convictions, contending the court abused its discretion and violated his federal and state constitutional rights to due process and a fair trial by (1) admitting without a proper foundation evidence of recorded and transcribed cell phone calls intercepted by the Imperial County Narcotics Task Force (Task Force)[1] and denying the defense the ability to cross-examine a prosecution witness or present expert testimony to challenge the reliability of the evidence of the intercepted calls, and (2) not striking on its own motion the testimony of a prosecution witness that Gamez was the person designated as "UM 22"[2] who was speaking during the numerous recorded and transcribed cell phone conversations─with drug-trafficker coordinator Guadalupe Castro Lopez (discussed, *post*)─that were lawfully intercepted in 2012 pursuant to a court order. We affirm the judgment.

---

[1]    The Task Force is a joint task force consisting of federal, state, county, and local agencies whose primary mission is the investigation of drug violations.

[2]    UM 22 means "Unknown Male 22."

FACTUAL BACKGROUND

A. *The People's Case*

The Task Force obtained a court order to intercept a phone line belonging to

Guadalupe Castro-Lopez (Castro) for 30 days during March and April 2012.[3] About 15

recorded phone calls, which were numbered, were played for the jury.

Task Force agents who listened to the recorded and transcribed conversations on

that phone line heard an unidentified male, whom the Task Force referred to as UM 22 in

the transcripts of those conversations, speaking in coded language with Castro. The

conversations indicated that UM 22 and Castro were working as "coordinators" for a drug

trafficking organization and arranging the transportation of the drugs by people known as

"couriers."

On April 10 the agents overheard UM 22 and Castro coordinating a drug transfer

across the United States-Mexico border at 8:00 a.m. the following morning.

The following morning (April 11), intercepted calls indicated that Castro's drug

courier, later identified as Sotero Soto, had crossed the border with the drugs and had

stopped for gas at a 7-Eleven store. Agents went to two 7-Eleven locations to observe

and prepare an inventory of the vehicles being fueled at the gas pumps there.

Other intercepted calls that morning (April 11) indicated Soto would meet UM

22's drug courier, Frank Duarte,[4] at a car wash. Agents went to self-service car washes

---

[3] All further dates are to calendar year 2012 unless otherwise indicated.

[4] Gamez's codefendant, Duarte, pleaded guilty before Gamez's trial began.

in the area, including the car wash across the street from the Immigration Detention Center.

During one of the intercepted calls that morning, Castro indicated to his courier, Soto, that the narcotics were in a battery and that the courier who would receive the battery from Soto (Duarte) was slender, had a mustache and ponytail, and was driving a blue Chevrolet pickup truck. Agents watching the car wash in front of the detention center saw a blue pickup truck matching Castro's description.

Soon thereafter, another call confirmed for the agents that they were watching the correct location, because UM 22 scolded Castro during the call for setting up the transfer in front of a law enforcement facility. As they were watching the light blue pickup, the agents also saw a white convertible Chrysler PT Cruiser, which had been seen earlier at a nearby 7-Eleven gas station. Duarte drove the blue pickup truck next to Soto, who was in the white PT Cruiser.

Photographs of the two vehicles together at the carwash and Duarte meeting with Soto there were published to the jury. Both men got out of their vehicles, Soto lifted the hood of his PT Cruiser, lifted out a car battery and handed it to Duarte, Duarte put the battery under the hood of his pickup truck, and soon thereafter both Soto and Duarte closed the hoods of their vehicles and drove away from the carwash.

Task Force agents followed Duarte's truck as it traveled north through El Centro toward Brawley and the Border Patrol's Westmorland checkpoint. The agents notified the Border Patrol at that checkpoint that the truck might be carrying drugs. When Duarte, whom UM 22 was coordinating, reached the checkpoint, a Border Patrol agent's canine

4

partner alerted the agent by pulling him to the truck. After obtaining Duarte's consent to a search of the truck, agents found two batteries in the engine compartment. Stuffed inside of one of the batteries, which was unconnected, the agents found over two kilos of methamphetamine and over one kilo of heroin.

The following day, April 12, Task Force agents listening to UM 22 and Castro's intercepted phone conversations heard them discussing the previous day's seizure of the narcotics from Duarte. Using code language, UM 22 told Castro they had 30 successful trips before that one unsuccessful trip.

During another intercepted phone conversation earlier that day, Castro told UM 22 he was at AutoZone. Shortly thereafter during another intercepted phone call—specifically, call No. 1028—UM 22 indicated he was at a 7-Eleven gas station, and Castro asked UM 22 to meet him at the AutoZone. As this recorded phone conversation was taking place, Task Force agents conducting surveillance observed Castro at an AutoZone in El Centro, talking on his cell phone. Specifically, Pete Peraza, an agent assigned to the Task Force and one of the agents conducting surveillance at that AutoZone on April 12, testified he listened to the recording of call No. 1028. Agent Peraza also testified that, as Castro and UM 22 conversed during that phone call, he observed Castro talking on a phone at the AutoZone.

Shortly thereafter the Task Force agents watched as Gamez drove up to the AutoZone in a black Jeep Cherokee and met with Castro. Agent Peraza testified that several photographs were taken of the Jeep Cherokee and its driver at the AutoZone. Those photographs were published to the jury and admitted into evidence. At trial, Agent

5

Peraza identified Gamez as the driver of the Jeep Cherokee he had seen at the AutoZone, and as the driver of the Jeep Cherokee shown in the photographs published to the jury.

When the April 12 morning meeting between Gamez and Castro at the AutoZone in El Centro ended, the Task Force agents watching the meeting saw Gamez and Castro drive away in their vehicles. Task Force agents followed Gamez. Gamez drove to an AutoZone in Calexico and Castro drove to a 99 Cent Store in Calexico.

The parties stipulated at trial that the Jeep Cherokee that Task Force agents followed to the AutoZone in Calexico was registered to Gamez.

After he left the AutoZone in Calexico, Gamez drove to the 99 Cent Store in Calexico, where he again met with Castro. Their movements were consistent with intercepted phone conversations.

To further confirm Gamez was UM 22, Task Force agents checked border crossings for a time period when UM 22 said he was in Mexico and later said he was back in the United States. On April 9, 2012, at about 4:28 p.m., UM 22 told Castro he was in Mexicali, Mexico. About 45 minutes later, at 5:18 p.m., Gamez crossed the Calexico East Port of Entry into the United States. Later that evening, during an intercepted phone conversation at around 6:54 p.m., Gamez told Castro he was in the United States.

B. *Defense Case*

The defense rested without presenting evidence.

6

DISCUSSION

## I. *THE COURT'S ADMISSION OF EVIDENCE OF THE INTERCEPTED PHONE CONVERSATIONS, LIMITATION OF DEFENSE CROSS-EXAMINATION, AND EXCLUSION OF DEFENSE EXPERTS*

Gamez first contends his conviction must be reversed because the court abused its discretion and violated his federal and state constitutional rights to due process and a fair trial by admitting, without a proper foundation, evidence of the recorded and transcribed cell phone calls intercepted by the Task Force, and by denying the defense the ability to cross-examine a prosecution witness─Task Force Agent Scott Templin─or present expert testimony to challenge the reliability of the evidence of the intercepted calls. This contention is unavailing.

A. *Background*

During a pretrial proceeding, after the court ruled on Gamez's written in limine motions, Gamez raised what his counsel referred to as a "*Kelly-Frye*[5] issue regarding the sophisticated technology used" to intercept cell phone calls. Arguing that the prosecution was required to lay a foundation showing "how these signals were turned from 0's and 1's into voices," defense counsel stated:

---

5     See *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013 (*Frye*). The "*Kelly-Frye* test," currently called the *Kelly* test or *Kelly* rule in California (*People v. Soto* (1999) 21 Cal.4th 512, 515, fn. 3), is a judicially created rule or standard for evaluating the reliability and admissibility of new scientific evidence. (See *People v. Wilkinson* (2004) 33 Cal.4th 821, 845.) Under the *Kelly* test, "evidence based upon application of a new scientific technique . . . may be admitted only after the reliability of the method has been foundationally established, usually by the testimony of an expert who first has been properly qualified. The proponent of the evidence must also demonstrate that correct scientific procedures were used." (*People v. Soto*, *supra*, 21 Cal.4th at pp. 518-519.)

"[A]s we all know, a cell phone is a misnomer. It's not a cell phone. It's really a computer and it's a radio. What the computer essentially does is it takes apart, it deconstructs any sound in the ambience, it turns it into 0's and l's, this computer does, and then it transmits these packets and it bounces off a series of cell towers, that's why they call them cell phones, the signal 01111 bounces off until it gets to a receptor, which has a specific number. And once that computer receives it, the computer reconstructs the 0's and 1's and turns them into the same ambient sounds supposedly. It's a radio transmitter, radio receiver. [¶] What we have had in the past is we have had tony technology, and I believe the intercept uses a form of tony technology because that's the only way this call could have been intercepted. You create another phone out there that is trapping the same signal which is intended from a particular phone, [and] which, in theory, can discriminate from all of the other calls in the world, it discriminates the call coming in on this particular line. So it's duplicating two phones. It's duplicating the calling phone and the receptor phone. [¶] . . . [T]his is borderline science in terms of trials, in terms of appellate courts. . . . Let these guys justify how this is done. *So they need a foundation as* [*to*] *how these signals were turned from 0's and 1's into voices, and they are pretty accurate.* You know, just because we accept it, just as we accept fingerprints, at least just tell us how you did it, how it came about." (Italics added.)

Likening the process to human ears, the court stated, "When you speak, the sound that you make goes into my ears . . . and it goes in and bounces off the hammer and stirrups and all of the hundreds of thousands of little hairs and things that are in there, it's transmitted, it's converted to electrical impulses and then I hear it." The court observed, "It's almost like you're asking the Court to have an expert or somebody come in to testify that because I heard something, here is the way it works." The court explained the evidence would include recorded conversations and testimony that officers were simultaneously observing the persons who were being recorded. The court also explained that several other recorded conversations describing the conspiracy would be

8

played, and the jury would decide whether the voices were the same or different. The court stated "there will be a foundation laid, of course," for the conversations. However, the court indicated it did not see the need to require testimony on what happens when a person speaks into a cell phone.

The prosecutor responded by arguing "this is generally accepted technology," adding:

> "[I]f the People were to introduce evidence that there was a car driving, we don't have to explain how the car drove. This is a similar matter. This has been introduced. Cell phones have been around for 20 years and they have been coming into court for 20 years, many are wiretap cases. The People do not have to lay that foundation. *We don't have to call somebody from the phone company to explain the technology*." (Italics added.)

The prosecutor then indicated that the technical process by which conversations are captured was irrelevant.

The court ruled the People were required to present witnesses to testify about "how their system works" and the warrant process, as well as about how, through the phone company, they are able to have the conversations routed to the law enforcement center, and how the conversations were monitored. The court indicated it would not require the People to present testimony on "how the technology works."

The court later excluded two proposed defense witnesses with expertise in digital computers, Daniel Libby and Rick Saul, finding their testimony was irrelevant in light of the court's prior in limine ruling (discussed, *ante*). As a separate basis for excluding these witnesses, the court found defense counsel had failed to timely disclose those witnesses to the prosecution as required by Penal Code section 1054.7.

9

At trial Agent Templin, a supervisory Border Patrol agent at the El Centro Sector Intelligence Division as well as a member of the Task Force, testified that the Task Force obtained a court order in early 2012 to intercept a phone line belonging to Castro for a period of 30 days during March and April. Agent Templin explained the procedures law enforcement must follow to monitor a phone line, including finding probable cause that the phone is being used to commit the offenses being investigated, such as the drug offenses the Task Force was investigating in this case, and drafting warrants, supporting affidavits, and court orders that are reviewed by the district attorney's office and ultimately by a judge, who reviews the documents for legal sufficiency. Agent Templin testified that, after a judge approves the order, "we send the court order to the telecommunications company, whether it be Sprint, for instance, [and] they review the court order, make sure everything is met. And once they determine that, they forward the calls, intercepted lines that are authorized by that court order to our facility."

Agent Templin also testified that the foregoing procedures were followed in this case. Ruben Haro, a monitor (translator) who worked on this case, testified the transcripts presented at trial were accurate translations of the recorded calls.

During his cross-examination of Agent Templin, defense counsel asked about the special equipment used to intercept the phone number pursuant to the court order. Agent Templin testified, "We have a number of equipment, quite a bit of equipment. There [are] servers. There [are] monitoring stations. There is a lot of equipment that I'm not—I don't know all of the details of [what] is used as far as intercepting telephones, no, sir."

Over a prosecution objection, the court permitted defense counsel to ask Agent Templin

questions about how a phone line is routed from the phone company to law enforcement:

> "[Defense counsel]: So you are not qualified to tell the jury how you came about to intercept and knowing you would always intercept the same number over and over and over; is that correct?
>
> "[Agent Templin]: (No response.)
>
> "[Defense counsel]: That you would have Castro's calls exclusively and nobody else's as opposed [to] tens of thousands of calls on any day?
>
> "[Prosecutor]: Objection. Motion in limine. It was litigated.
>
> "THE COURT: I think what [defense counsel] is asking is how is this one line routed to law enforcement. [¶] Is that your question?
>
> "[Defense counsel]: Thank you, Your Honor. You phrased it more artfully than I ever could.
>
> "THE COURT: Do you know how that happens, how they route that one call to you? Is it directed to your location, to your monitoring stations?
>
> "[Agent Templin]: I can go through the process and explain what I do know about this.
>
> "THE COURT: If you would, please.
>
> "[Defense counsel]: Please.
>
> "[Agent Templin]: When we get the court order to the people we work with that submit everything to the telecommunications company, . . . they will let us know that the line has been redirected back to us. *And it's been very reliable. When we send a [court order] up to [a telecommunications] company, I can't recall any situation where . . . there was a mistake in the device we were receiving calls from.*" (Italics added.)

11

As shown by the following colloquy, when defense counsel continued asking Agent Templin about the technology involved in intercepting phone lines, the court sustained objections by the prosecutor, and defense counsel moved on to another line of questioning:

> "[Defense counsel]: Okay. Now, speaking of the device, are you familiar with . . . phone cloning technology?
>
> "[Prosecutor]: Objection, Your Honor. This has been litigated.
>
> "THE COURT: Sustained.
>
> "[Defense counsel]: So you have no knowledge that more than one phone could have been using that particular signal, do you?
>
> "[Prosecutor]: Objection. Foundation.
>
> "THE COURT: It does lack foundation, [defense counsel].
>
> "[Defense counsel]: I've just been estopped from laying foundation?
>
> "[Prosecutor]: We litigated it previously.
>
> "[Defense counsel]: Okay. I'll move on, Your Honor.
>
> "THE COURT: Thank you."

B. *Applicable Legal Principles*

"To be admissible in evidence, a writing must be relevant and authenticated." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266, citing Evid. Code, §§ 350, 1401.) "The proffered evidence must be an original writing or otherwise admissible secondary evidence of the writing's content." (*Goldsmith*, at p. 266, citing Evid. Code, §§ 1520, 1521.) In addition, "it must not be subject to any exclusionary rule." (*Goldsmith*, at p. 266, citing Evid. Code, § 1200.)

12

"Audio recordings are writings as defined by the Evidence Code." (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1002 (*Dawkins*), citing Evid. Code, § 250.) Thus, like other writings, audio recordings must be shown to be what they purport to be; that is, that they are genuine for the purposes offered. (*Dawkins*, at p. 1002.) "Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.'" (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

"An audio recording is typically authenticated by showing it is a reasonable representation of that which it is alleged to portray." (*Dawkins*, *supra*, 230 Cal.App.4th at p. 1002.) "Typically, a party to the conversation recorded is called to testify to the audio recording's accuracy. However, the foundation may, but need not, be supplied by the person witnessing the event being recorded. It may be supplied by other witness testimony, circumstantial evidence, content and location, or any other means provided by law, including statutory presumption." (*Ibid*., citing *Goldsmith*, *supra*, 59 Cal.4th at p. 268.)

1. *Standard of review*

A trial court's decision to admit or exclude evidence is reviewed on appeal for abuse of discretion and will not be disturbed "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

13

C. *Analysis*

1. *Forfeiture*

We first reject the Attorney General's contention that Gamez "forfeited his challenge to the manner in which the recorded calls were obtained because he failed to file a motion to suppress the intercepted calls on that basis under Penal Code[6] section 1538.5."  In support of this forfeiture claim, the Attorney General asserts that "[s]ection 629.72 limits the grounds for challenging the admission of intercepted communications and requires those challenges be raised in a motion to suppress under [section 1538.5]."

The Attorney General's reliance on section 629.72 is misplaced because it is not applicable here.  In California, the interception of a wire or electronic communication is governed by the Presley–Felando–Eaves Wiretap Act of 1988 (§ 629.50 et seq.) (Act). (See *People v. Roberts* (2010) 184 Cal.App.4th 1149, 1159.)  Section 629.72 specifies the grounds on which a motion under section 1538.5 to suppress either the contents of an intercepted wire or electronic communication, or evidence derived from therefrom, may be brought.  Specifically, section 629.72 provides that a such a motion may be brought "only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter":

> "Any person in any trial, hearing, or proceeding, *may move to suppress some or all of the contents of any intercepted wire or electronic communications, or evidence derived therefrom, only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter*.  The motion shall be made, determined, and be subject to

_____

6     All further statutory references are to the Penal Code unless otherwise specified.

review in accordance with the procedures set forth in Section 1538.5." (Italics added.)

Here, however, Gamez did not seek to suppress the evidence of the intercepted phone calls on the basis that evidence was "obtained in violation of the Fourth Amendment of the United States Constitution or of [the Act]" within the meaning of section 629.72. Gamez correctly asserts that "defense counsel challenged the foundation, reliability, and relevance of the evidence under general rules of evidence, not based upon a violation of the [Act]." He did not, and does not, challenge the lawfulness of the underlying wiretap order under the Fourth Amendment, or the lawfulness of the interception, and he did not and does claim a violation of any statutory requirement set forth in the Act. Because section 629.72 is inapplicable, we conclude Gamez did not forfeit his right to challenge on appeal the court's rulings regarding the cell phone evidence by failing to file a motion to suppress that wiretap evidence.[7]

2. *The evidence of the intercepted phone calls was adequately authenticated*

We also conclude the court did not err in determining, over Gamez's objections, that the prosecution had laid a proper prima facie foundation authenticating the challenged evidence of the intercepted phone calls between Castro and UM 22, whom Agent Peraza identified in court both as the driver of the Jeep Cherokee he had seen at the AutoZone, and as the driver of the Jeep Cherokee shown in the photographs taken at the scene and published to the jury. As discussed more fully, *ante*, Agent Templin

---

[7] In light of our conclusion, we need not address the merits of the Attorney General's argument that Gamez cannot establish his trial counsel provided ineffective assistance by failing to file a motion to suppress that wiretap evidence.

15

testified that the Task Force obtained a court order in 2012 to intercept Castro's phone line for 30 days. He explained the procedures that law enforcement followed to monitor Castro's phone line, including finding probable cause that the phone was being used to commit drug offenses and drafting warrants and court orders that were reviewed by the district attorney's office and a judge. Agent Templin also testified that after a judge approved the wiretap order, it was sent to a telecommunications company that forwarded the authorized calls to the law enforcement facility in El Centro. Agent Templin further testified that, in his experience, the foregoing process used in this case had been uniformly reliable. An experienced translator who interpreted the recorded calls also testified and verified the transcripts presented at trial contained accurate translations of the calls.

As already discussed, the foundation for authenticating audio recordings may also be supplied by their contents. (*Dawkins*, *supra*, 230 Cal.App.4th at p. 1002.) Here, as discussed more fully, *ante*, the observations by the narcotics agents who were watching as the drug transfer occurred, as well as the seizure at the checkpoint of the drugs from the second, unconnected battery found under the hood of courier Duarte's truck, further supported the authenticity of the recorded calls.

Gamez complains that "[t]he prosecutor did not lay any foundation through evidence as to how the calls are intercepted, whether the interception distorts sounds, whether and how law enforcement can be certain the calls are all coming from the targeted phone, and whether and how law enforcement can determine the identity of the other party (or device) to the intercepted call." However, given the foregoing evidence

16

we conclude the court reasonably determined the People had sufficiently established that the recordings were authentic, such that they could be presented as evidence to the jury.

3. *The court did not err in sustaining prosecution objections during Agent Templin cross-examination*

Gamez also asserts his convictions must be reversed because the court erroneously "denied the defense the ability to cross-examine" Agent Templin. As already discussed, during defense counsel's cross-examination of Agent Templin, the court sustained prosecution objections when defense counsel asked whether Agent Templin was familiar with phone cloning technology, and whether he knew "more than one phone could have been using that particular signal." Gamez's claim of evidentiary error is unavailing because, even if we were to assume the court abused its discretion by sustaining the objections, any such error was harmless because Gamez has failed to show it is reasonably probable that a result more favorable to him would have been reached in the absence of the error. (See *People v. Earp* (1999) 20 Cal.4th 826, 878.) Here, the conspirators' actions, which Task Force agents observed (as discussed, *ante*, in the factual background), were entirely consistent with the content of the intercepted and recorded cell phone conversations, and they corroborated the authenticity of the recordings, many of which were played for the jury.

4. *The court did not err in excluding the testimony of proposed defense experts*

Gamez also claims his convictions must be reversed because the court violated his constitutional right to present evidence in his defense. Specifically, he complains that, "[a]fter ruling that the prosecutor could admit cell phone evidence without establishing

17

any foundation for the methodology by which the information was obtained and recorded," the court "[p]reclud[ed] defense counsel from challenging the cell phone evidence . . . through presentation of an expert to explain the imprecision of the science of cell phone transmissions," thereby denying him the opportunity to present his defense. Gamez's claim is unavailing.

The court excluded two proposed defense witnesses with expertise in digital computers, Daniel Libby and Rick Saul, finding (1) their testimony was irrelevant,, and (2) defense counsel had failed to timely disclose those witnesses to the prosecution as required by section 1054.7.

In support of his claim that the court erroneously excluded the defense expert testimony on the ground it was not relevant, Gamez asserts "the reliability and methodology of the interception of those calls was critical to the defense—whether they were accurate[ly] and reliabl[y] shown as communication from Castro's phone, whether they permitted detection of the non-targeted but intercepted second device (and) person, and whether they distorted sound such that the jury could reliably discern whether all of the voice[s] in all of the calls designated as 'UM-22' were the same person." Gamez essentially is challenging again the court's determination that the prosecution had laid a proper foundation authenticating the prosecution's evidence of the intercepted phone calls between Castro and UM 22. For reasons discussed, *ante*, we have already concluded the court properly determined that the People had sufficiently established the recordings were authentic such that they could be presented as evidence to the jury. We conclude the court properly excluded the proposed defense experts on the ground their testimony was

18

not relevant. Even if we were to assume, without deciding, that the court erred in excluding as irrelevant the testimony of the untimely-designated defense experts, we would conclude such error was harmless inlight of the strong evidence (discuss, *ante*) that Gamez was the person designated as UM 22. In light of our conclusions, we need not reach the merits of Gamez's claim that "the exclusion of his proposed expert as a sanction for a discovery violation" was an abuse of discretion and violated his right to due process.

## II. *AGENT TEMPLIN'S TESTIMONY THAT GAMEZ WAS UM 22*

Last, Gamez contends his convictions must be reversed because the court abused its discretion and violated his constitutional rights to due process and a fair trial by not striking on its own motion Agent Templin's testimony that Gamez was the person designated by the Task Force as UM 22 who was speaking with Castro during the numerous intercepted, recorded and transcribed cell phone conversations. This contention is unavailing.

### A. *Background*

Gamez moved in limine to exclude expert testimony that the voice labeled as UM 22 on the transcripts of the intercepted calls was the same as Gamez's voice. At the pretrial hearing on Gamez's motion, defense counsel withdrew the motion after the prosecutor agreed she would not ask any witnesses to identify UM 22 as Gamez based on the similarity of UM 22's voice to Gamez's voice, and she would ask the jury to compare the voices and decide whether UM 22's voice and Gamez's voice were the same voice.

On a defense motion, the court ordered the People to modify the transcripts of the recorded calls to refer to the voice of UM 22 as UM 22's, rather than as Gamez's. The

19

People thereafter modified the transcripts for each of the recorded calls to refer to UM 22's voice as that of "UNKNOWN MALE 22" or "UM 22."

In her opening statement, the prosecutor indicated the evidence would show that agents listened to calls between UM 22 and Castro as they coordinated a drug transfer, and later, while simultaneously listening to conversations between UM 22 and Castro, they observed and photographed Gamez meeting with Castro at an Auto Zone in El Centro. The prosecutor asked the jury to listen to the voice of the person talking to Castro in the recordings that would be played, and argued "it's the same voice":

> "You will hear the voice, get to hear the calls yourself and compare whether or not you think [the] voice at Auto Zone is indeed the same voice you heard coordinating that load. You will hear he is talking to the same person, [Castro]. They have [the] same type of conversations. And you will hear it's the same voice. You can hear that with your own ears."

During trial, Agent Templin listened to numerous recorded conversations between UM 22 and Castro that were played for the jury, and testified the conversations were consistent with drug trafficking activity. In discussing those conversations, Agent Templin consistently referred to Castro as "Mr. Castro" and UM 22 as "UM 22."

However, while discussing one of the calls, Agent Templin referred to UM 22 as "Mr. Gamez":

> "Mr. Castro appeared to be the coordinator responsible for tasking the courier that just brought the drugs through the Pornt of Entry. *Mr. Gamez* was responsible for the coordination of the second courier that Mr. Soto was supposed to meet up with at the car wash." (Italics added.)

20

Defense counsel did not object. Soon thereafter, when asked about the relevance of another recorded call that was played for the jury, Agent Templin made the same mistake, defense counsel objected, and the court admonished Agent Templin that UM 22 had not yet been "officially identified":

> "[Agent Templin]: In this call *Mr. Gamez* is giving instruction to Mr. Castro to tell him to tell his courier—
>
> "[Defense counsel]: *I'm going to object*[], Your Honor. This is—UM-22.
>
> "THE COURT: *As UM-22 has not been officially identified yet, it is still UM-22*.
>
> "[Prosecutor]: Okay. [¶] At this point that person was still UM-22; is that correct?
>
> "[Agent Templin]: Yes. At this point he's still known as UM-22." (Italics added.)

Agent Templin thereafter referred to UM 22's voice in the recordings as UM 22, not Gamez.

During her closing argument, the prosecutor again emphasized that the jurors had to "listen for themselves" to the recorded phone calls and decide for themselves whether UM 22's voice in the recordings was the same as Gamez's voice.

B. *Analysis*

Gamez complains that when Agent Templin, during his testimony on direct examination, twice referred to Gamez as the person designated as UM 22 who was talking to drug-trafficking coordinator Castro in the recordings of the intercepted call

21

played for the jury, the court did not strike on its own motion those portions of Agent Templin's testimony.

We conclude the court did not abuse its discretion or violate Gamez's violated his constitutional rights to due process and a fair trial by not striking Agent Templin's testimony that Gamez was UM 22. The California Supreme court has recognized that, in an appropriate case, a trial court need not strike objectionable testimony, and instead may give a curative admonition. (See *People v. Thompson* (2010) 49 Cal.4th 79, 129-130.) Here, when defense counsel objected, the court immediately admonished both Agent Templin and the prosecutor in front of the jury, stating, "As UM-22 has not been officially identified yet, it is still UM-22." The record shows Agent Templin heeded that curative admonition and thereafter referred to UM 22's voice in the recordings only as UM 22.

Even if we were to assume, without deciding, that the court abused its discretion by not striking Agent Templin's fleeting reference to Gamez as UM 22, we would conclude that, in light of the strong evidence that Gamez was the person speaking to Castro during the intercepted phone calls, any such error was harmless. The California Supreme Court has explained that "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent

22

the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439, citing *People v. Earp*, *supra*, 20 Cal.4th at p. 878 & *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the court's assumed error did not render the trial fundamentally unfair, and Gamez has failed to meet his burden of showing a reasonable probability he would have obtained a more favorable outcome in the absence of the error.  In light of the court's prompt correction of Agent Templin's testimony, it is unlikely the jury would have returned a more favorable verdict had the court stricken that testimony.  As already noted, the prosecutor emphasized during her closing argument that the jurors should "listen for themselves" to the recorded phone calls and decide whether UM 22's voice in the recordings was the same as Gamez's voice.  In addition, as discussed, *ante*, the prosecution presented evidence showing that Task Force agents witnessed Gamez acting in a manner that was consistent with UM 22's statements to Castro during the recorded conversations.  Also, Agent Peraza identified Gamez at trial as the driver of the Jeep Cherokee he had seen at the AutoZone, and as the driver of the Jeep Cherokee shown in the photographs published to the jury.  In addition, the parties stipulated at trial that the Jeep Cherokee that Task Force agents observed at the AutoZone in El Centro and later followed to the AutoZone in Calexico was registered to Gamez.

For all of the foregoing reasons, we affirm the judgment.

DISPOSITION

The judgment is affirmed.


                                                              NARES, Acting P. J.


WE CONCUR:


McDONALD, J.


IRION, J.