Filed 11/12/24  P. v. Cooper CA4/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081754 |
| v. | (Super.Ct.No. BAF2200250) |
| DANTE TRIMELL COOPER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Rene Navarro, Judge.

Affirmed.

Lizbeth Weis, under appointment by the Court of Appeal, for Defendant and

Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and James

H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Dante Trimell Cooper and J.W. are brothers.  J.W. had

stored his belongings at defendant's apartment.  On March 2, 2022, while J.W. was

1

packing up his belongings, he hit defendant on the head (two times) and ran to the neighbor's apartment. Defendant grabbed his gun, followed J.W. to the neighbor's apartment, and fired at him until the gun was empty. J.W. survived. Defendant was convicted of, alter alia, willful, premeditated, and deliberate attempted murder. (Pen. Code,[1] §§ 187, 664.) On appeal, he challenges the denial of his motion for mistrial and his motion for a judgment of acquittal under section 1118.1. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

On March 2, 2022, while in the process of moving out of his Hemet apartment, defendant ordered his brother (J.W.) to "get [his] shit outta here." J.W. did not live in the apartment, he "just [left his] things there." The brothers' relationship was "kind of rocky." As J.W. was retrieving his belongings, he asked defendant where his (J.W.'s) tax refund or stimulus check was, and they started arguing. As the argument escalated, defendant told J.W. to "get your life together." J.W. responded, "'I would, if I had my money,' and that's where it got crazy."

Defendant, grabbed a black nine-millimeter gun from a bag and held it at his side, pointing down.[2] When J.W. complained that defendant pulled out his gun every time the two argued, defendant pointed the gun at J.W.'s chest. J.W. told defendant, "Put the gun down. I'll knock your ass out." Defendant lowered the gun and put it in the bag, but kept

---

[1] Unlabeled statutory references are to the Penal Code.

[2] There is a "significant size disparity between the two" brothers. Defendant is five feet 11 inches tall and 180 pounds, while J.W. is "approximately six two, maybe 280 pounds."

2

"it close to his leg." As the two continued to argue, J.W. asked if defendant wanted a particular table, adding, "You got everything else of mine." J.W. walked toward the door to leave, grabbed a pole (a three-foot table leg that he used for protection), turned around "real quick to swing it," and hit defendant in the head. Defendant started yelling, dropped the bag, and began "squirming and going wild," trying to grab for the bag. J.W. struck defendant a second time, grabbed the bag, and ran to a neighbor's apartment.

J.W. asked the neighbor, M.M., to call the police. Another neighbor, L.W., heard the commotion, went outside, and saw J.W. at M.M.'s apartment. As defendant came out of his apartment, L.W. described him as bloody, "very angry," and smaller than J.W. Defendant exclaimed, "'He shot me in the face.'" Defendant first came out of his apartment with nothing in hand, but then went back inside. Simultaneously, J.W. went inside M.M.'s apartment, over M.M.'s objection. When defendant came outside again, he "went after" J.W. with a gun; he looked "pissed." Defendant fired shots into J.W.'s chest from a range of "about 25 inches" while J.W. was standing in M.M.'s doorway. J.W. ran into M.M.'s apartment and defendant followed, firing more shots at his brother. M.M. never saw J.W. with a gun, but J.W. told him (M.M.) there was a gun inside the bag. Police recovered a large pole, three projectiles, and a handgun in a bag from M.M.'s apartment. Defendant's apartment had a lot of blood.

Police arrived and spoke to J.W. who pointed to defendant and said, "'That's him right there, the person who shot me.'" Defendant told an officer that he had been shot; however, the officer had not observed anything to support such a claim. Rather, defendant appeared to have suffered a blunt force injury. The officer overheard

3

defendant tell the EMT medics that he had shot his brother until he "ran out of bullets" and J.W. "fell over and covered himself."[3] Following his arrest, defendant agreed to speak with detectives; his interview was played for the jury.

In the interview, defendant admitted shooting J.W.; however, he claimed that J.W. attacked him as he slept in a chair. Defendant heard "a thud" and "thought" he had been shot in the face.[4] Believing that he was going to die, he thought, "I gotta try to kill [J.W.] back." He had two guns, a Glock that he kept in a bag by his side, and a .38 that he kept in his closet. Defendant ran outside and saw J.W. at a neighbor's door. When he heard J.W. tell the neighbor, "sir, he just pulled a gun on me," defendant ran back into his house and retrieved his .38 from the closet. He went outside again, found J.W. at the neighbor's doorstep, and fired shots until the gun was empty. When the detective asked why he went back and got a gun, defendant replied, "I was panicking, sir. He woke me up out of a sleep, and I thought I was shot." He added that he thought he was going to die and he "gotta try to kill him back or something."

After pointing out that J.W. had left defendant's apartment, and there was no longer an active threat, the interviewing detective noted that defendant "chased [J.W.]

---

[3] The officer also testified that defendant "told medical staff that he owns two firearms, although he had served 15 years in prison." In response to this statement, defense counsel unsuccessfully moved for a mistrial.

[4] Defendant later stated, "'Cause I was asleep, and I just—you get hit in the face with a pole, obviously, you—you don't—you're not gonna know. You just—all I just hear is a thud, and I'm like blood squirting out. So I'm running out the house. . . . I don't know if before or after when I was running out, but I was screaming he shot me in the face."

down." The detective then stated, "You could've shut your door. You could've locked your door, and you could've called police." Defendant replied, "That's true. But now, what about the gun he took? 'Cause I don't know where that bag is at." When the detective emphasized that J.W. was gone, defendant explained, "But I didn't start this. I didn't initiate it." He justified his act of chasing down J.W. by pointing out that "cops kill people for less." When asked where he was aiming when he shot J.W., defendant said, "I was just shooting, man. I wasn't trying to shoot him in the head, face, man. It wasn't no particular area. I was just—seen him and just start squeezing, man, like 'cause I'm [go]nna die."

J.W. suffered gunshots to the arm, chest, back, and abdominal areas. By stipulation, the jury heard that defendant was convicted of a felony.

Following the close of evidence, the defense moved for a judgment of acquittal on all counts, but in particular, the attempted murder charge under section 1118.1. The defense argued there was no evidence of willful premeditation and deliberation. The trial court denied the motion.

A jury convicted defendant of attempted murder (§§ 187, 664), assault with a semiautomatic firearm (§ 245, subd. (b)), and being a felon in possession of a firearm (§ 29800, subd. (a)(1)). The jury found that the attempted murder was willful, premeditated and deliberate, and defendant personally and intentionally discharged a firearm proximately causing great bodily injury to another person. Separately, the trial court found that defendant had suffered a strike prior within the meaning of sections 667, subdivisions (c) and (e)(1), and 1170.12, subdivision (c)(1), that the attempted murder

involved great violence, great bodily harm, the threat of great bodily harm and a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1); unlabeled rule references are to the Cal. Rules of Court), that defendant had been armed with and used a firearm (rule 4.421(a)(2)), and that he had previously suffered a prison prior (rule 4.421(b)(3)). He was sentenced to state prison for an aggregate term of 39 years to life, plus 18 years four months.

## II. DISCUSSION

### A. The Trial Court Properly Denied Defendant's Motion For Mistrial.

Defendant contends the trial court abused its discretion by denying his motion for mistrial based on witness testimony that he had spent 15 years in prison.

*1. Further background information.*

Defendant was charged with felon in possession of a firearm. In a pretrial motion, the prosecutor represented that he intended to "sanitize" the underlying felony during trial. Defendant elected against testifying, and the parties stipulated that his prior felony would be sanitized so that the jury would only learn that he "had previously been convicted of a felony," without making reference to the specific felony, how serious it was, or how long he had served in prison. Notwithstanding the parties' stipulation, one of the officers, who rode in the ambulance with defendant, testified that he had heard defendant tell medical staff that "he owns two firearms, although he had served 15 years in prison." Defense counsel objected and moved to strike the testimony. The court sustained the objection, granted the motion, and directed the jury "to disregard the last

6

answer by the witness in its entirety [and not] consider it at all in reaching any decision in this case as to any of the issues."

Defense counsel also moved for a mistrial based on the testimony that defendant had served 15 years in prison. Counsel argued the testimony "deprives [defendant] of a fair trial, and there is no way for [the jurors] to unhear that, and now they may think that [he] is a bad and dangerous man, and if they were on the fence about these charges, they would be inclined to convict [him] and hope for a high sentence for [him]." Although counsel did not fault the People for the officer's particular response, he asserted that "it was gratuitous and intentional on the part of law enforcement and outrageous misconduct." The trial court denied the motion, explaining that the response was gratuitous, but the court had sustained defendant's objection, struck the answer in its entirety, and admonished the jury to disregard it. The court stated that, without further guidance, the jury would not know what a 15-year term means, and the court expects jurors to follow the instruction to disregard the testimony.

Defense counsel unsuccessfully raised the issue again in a motion for new trial, repeating his argument that the testimony prejudiced defendant because the jurors "heard it, and it was impossible for [him] to receive a fair trial after that." Citing *People v. Prysock* (1982) 127 Cal.App.3rd 972 (*Prysock*), the trial court found that "any prejudice that may have been had by the officer blurting it out was cured by the Court's immediate response to it."

*2. Standard of review.*

"""A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ""a [defendant's] chances of receiving a fair trial have been irreparably damaged.""" [Citation.] "Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." [Citation.]' [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

"The standard of review of a ruling denying a mistrial motion and a ruling denying a new trial motion is the same: abuse of discretion. [Citations.]" (*People v. Rices* (2017) 4 Cal.5th 49, 92.)

*3. Analysis.*

Defendant offers three reasons in support of his claim the trial court abused its discretion in denying his motion for mistrial: (1) The length of the jury's deliberations compared to the length of the trial indicate the case was close. (2) The evidence of his 15-year prison term was not vague, evokes an emotional bias that has no bearing on the issues, and gave the jury a reason to mistrust his claim of self-defense. (3) The court's reliance on *Prysock* was misplaced. As we explain, the court acted within its discretion when it denied the mistrial motion and when it later denied a new trial on the same grounds.

8

Claiming the length of the jury's deliberations indicates a close case, defendant points to the amount of time the jury deliberated, compared to the amount of time it took to hear the testimony (2 and a half hours for deliberations versus 5 hours for testimony).[5] However, there is no reason to believe that the length of deliberations is an indication of the closeness of a case. "[T]he length of the deliberations could . . . be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision." (*People v. Walker* (1995) 31 Cal.App.4th 432, 439 [six and a half-hour deliberation following two and a half-hour presentation of evidence did not indicate that the evidence was closely balanced].)

Next, defendant reasons the specific reference to defendant's prison term—15 years—was not vague, evoked an emotional bias that has no bearing on the issues, and gave the jury a reason to mistrust his claim of self-defense. Not so. At its best, the claim of self-defense was not compelling. While J.W. was the initial aggressor, he had retreated, leaving defendant's apartment. Nonetheless, after defendant confirmed J.W.'s location outside, he (defendant) retrieved his gun and pursued J.W., instead of locking the apartment door and calling the police. Moreover, the reference to defendant's prison term was an isolated remark by one witness that was stricken from the record, and the trial court admonished the jury not to consider it for any purpose. (*People v. Avila* (2006) 38 Cal.4th 491, 574 [no abuse of discretion in denying a mistrial motion after a witness

<hr/>

[5] Defendant speculates on the amount of time the jury deliberated on its first day by noting the record shows that deliberations began at 2:25 p.m., but does not indicate the time they ended that day. On the next morning, deliberations began at 9:02 a.m., and 19 minutes later jurors indicated they had reached a verdict.

mentioned the defendant recently getting out of prison because the court admonished the jury not to consider it for any purpose]; *People v. Valdez* (2004) 32 Cal.4th 73, 124-125 [where witness volunteered that defendant had been at Chino prison, no error in denying mistrial because reference was isolated and prejudice curable by instruction].)

Finally, defendant challenges the trial court's reliance on *Prysock*. Prior to sentencing, defense counsel requested the court reconsider its decision not to give defendant a new trial. In response, the court noted that it had immediately sustained the objection to the officer's testimony and instructed the jury to disregard it. It added, "One further observation I would make. There usually is no prejudice if . . . there is a timely objection and proper admonition is given to the jury. And so I would cite [*Prysock*] for that proposition." In *Prysock*, the objectionable testimony was the prosecutor's statement in closing argument that the codefendant had a Fifth Amendment privilege not to testify, but that if he "'would have made any statement to the police admitting striking [the victim], you[ would have] heard about it in court.'" (*Prysock*, *supra*, 127 Cal.App.3rd at p. 997.) The court sustained the defense objection and directed the jury to disregard the prosecutor's argument referring to calling the codefendant to testify. (*Id*. at p. 998.) The Court of Appeal held that "if the remark constituted misconduct, the prompt admonishment cured any harm." (*Ibid*.)

Defendant contends *Prysock* does not apply because "the inadmissible statement there was the prosecution's improper argument about the co-defendant," and the stricken argument "was not unduly prejudicial because it was 1) argument, and 2) it was not likely [to] result in any emotional bias or something that would stick in the minds of the juror[s]

10

such that the defendant's chances of receiving a fair trial were irreparably damaged." Even if we assume the trial court's reliance on *Prysock* was misplaced, we still conclude the court did not abuse its discretion in denying defendant's motion for mistrial because, as we later explain, sufficient evidence supports the jury's verdict. (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1004 ["A 'ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion. [¶] . . . [¶] In other words, it is judicial action, and not judicial reasoning or argument, which is the subject of review; and, if the former be correct, we are not concerned with the faults of the latter.' [Citation.]"].)

B. The Trial Court Properly Denied Defendant's Section 1118.1 Motion.

At the close of evidence, defendant moved under section 1118.1 for an entry of judgment of acquittal on all counts, but in particular the attempted murder charge. The trial court denied defendant's motion in its entirety; defendant appeals the court's ruling as to the attempted murder charge only.

*1. Further background information.*

In support of the section 1118.1 motion, defense counsel argued three paths to a conviction on a lesser charge. First, he claimed that, at most, defendant should be convicted of attempted second degree murder because the evidence was insufficient to establish willful premeditation since defendant did not bring a gun to the fight, it "was already at the property." Second, counsel asserted they had made a case for imperfect

11

self-defense and provocation which lowers the conviction to attempted voluntary manslaughter. And finally, counsel contended they had proved "self-defense, which is a complete defense to all of the offenses except for the felon in possession." In response, the prosecutor pointed out that defendant had told the police "very clearly that his intent was to, quote, kill him back" and there is no evidence he feared "imminent danger." The prosecutor argued the evidence establishes premeditation and deliberation because defendant went outside, then back into his apartment for the specific purpose of obtaining his gun, instead of using his phone to call for help. Defense counsel replied by referring to the definition of "deliberated" and "premeditation," and argued defendant's action is "really the definition of an irrational and impulsive act rather than one involving a careful weighing of considerations for or against his choice."

The trial court found sufficient and substantial evidence to sustain a conviction on appeal. It noted that "premeditation and deliberation can be made all in a split second . . . depend[ing] on the nature of the evidence . . . and the action and conduct of the defendant at the time of the commission of the offense."

2. *Standard of review.*

A judgment of acquittal of a charge is mandatory "if the evidence then before the court is insufficient to sustain a conviction of such offense . . . on appeal." (§ 1118.1.) A section 1118.1 motion "'weed[s] out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.'" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.) Therefore, where "there is evidence from which an inference of guilt is

12

justified a case will not be taken from the jury because an inference of innocence might also be drawn therefrom." (*People v. Wescott* (1950) 99 Cal.App.2d 711, 714.)

In deciding a section 1118.1 motion, the trial court inquires "whether from the evidence . . . including reasonable inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 89.)  We review "the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)  Accordingly, "[w]e review the whole record in the light most favorable to the judgment below to determine whether there is evidence which is reasonable, credible and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  This inquiry does not require the reviewing court to ask itself whether it believes the evidence established guilt beyond a reasonable doubt but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]" (*People v. Dalerio* (2006) 144 Cal.App4th 775, 779-780.)

*3.  Applicable legal principles.*

Attempted murder requires (1) a "specific intent to kill," which is the equivalent of express malice, and (2) a "direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; see *People v. Smith* (2005) 37 Cal.4th 733, 739 [noting that intent to kill and express malice are, in essence "'one and the same'"].)  Express malice is shown when the defendant "'either desires the

13

victim's death, or knows to a substantial certainty that the victim's death will occur.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) "[E]vidence of motive is often probative of intent to kill," but it "is not required to establish intent to kill." (*Smith*, at p. 741.) "One may [act] with or without a motive and still be found to have acted with express malice." (*Id*. at pp. 741-742.) Intent to kill may simply be "inferred from the defendant's acts and the circumstances of the crime." (*Id*. at p. 741.) For example, "the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Id*. at p. 742)

"[A]ttempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654.) In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court articulated three factors relevant to determining whether a defendant killed or attempted to kill with premeditation and deliberation: (1) evidence of the defendant's conduct prior to the killing—i.e. planning; (2) evidence regarding a defendant's prior relationship and/or conduct with the victim which could suggest a "motive" to kill; and (3) evidence about the nature of the killing. (*Id*. at pp. 26-27.) These factors are not required to find deliberation and premeditation, but remain useful in reviewing the evidence. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*Id.* at p. 1080.) "'The process of premeditation and deliberation does not require any extended period of time. "The

14

true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" (*Id*. at p. 1080.) To summarize, a finding of deliberation and premeditation requires the existence of "'preexisting thought and reflection,'" of any duration, "'rather than unconsidered or rash impulse.'" (*People v. Lopez* (2018) 5 Cal.5th 339, 354-355; see *People v. Solomon* (2010) 49 Cal.4th 792, 813.)

A person does not act with malice if he sincerely but unreasonably believes in a need to defend himself from the person he tries to kill, or acts in the heat of a passion resulting from provocation he reasonably attributes to the victim. (*People v. Rios* (2000) 23 Cal.4th 450, 460; *People v. Elmore* (2014) 59 Cal.4th 121, 133 ["Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense."].) "'No specific type of provocation is required, and "the passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"""""" other than revenge, including fear. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139 (*Millbrook*).)

To negate malice, passion must obscure a defendant's reason """"to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation or reflection, and from such passion rather than from judgment.'""" (*Millbrook*, *supra*, 222 Cal.App.4th. at p. 1137.) Imperfect self-defense requires an actual if unreasonable belief in a need "'to defend oneself from imminent peril to life or great bodily injury.'" (*In re Christian S*. (1994) 7 Cal.4th 768, 773.) If there is some evidence that a defendant charged with attempted murder was subject to such a passion,

15

or sincerely perceived a need to defend himself, the prosecution must prove beyond a reasonable doubt that the defendant did not act in the heat of passion, and did not act with an actual belief in the need to defend himself with deadly force. (*People v. Rios* (2000) 23 Cal.4th 450, 461-462; *Millbrook*, at pp. 1136-1137.) If the prosecution fails to bear that burden, the defendant can be convicted only of attempted voluntary manslaughter.

*4. Analysis.*

Defendant argues the evidence does not support a finding that he acted with premeditation and deliberation.

Contrary to his claims, we conclude substantial evidence supports the jury's finding of premeditation and deliberation. First, the evidence is sufficient to show defendant engaged in a level of planning prior to the shooting. Although defendant and J.W. provided different versions of J.W.'s assault on defendant, they both agreed that J.W. was the initial aggressor. J.W. testified that he hit defendant on the head two times with a pole; defendant acknowledged (to the investigating detective) that he had been hit in the face with a pole, but claimed he thought he had been shot. After hitting defendant, J.W. took one of defendant's guns, and went to a neighbor's house, asking the neighbor to call the police. Despite believing he had been shot in the face, defendant walked out of his apartment to track J.W. Upon confirming J.W.'s location, defendant went back inside his apartment, grabbed his other gun, pursued J.W., and fired at him until the gun was empty. This evidence shows defendant engaged in a level of planning prior to the shooting. (See *People v. Elliot* (2005) 37 Cal.4th 453, 471 ["That defendant armed himself prior to the attack 'supports the inference that he planned a violent encounter.'"];

16

see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["The act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind.'"].) A reasonable jury could have concluded defendant's conduct, coupled with his statement that he thought he was going to die and he "gotta try to kill [J.W.] back or something" established that defendant planned the attack immediately before shooting J.W.

Second, as to motive, defendant was angry that J.W. had attacked him and thought he was going to die. A reasonable jury could have interpreted defendant's "demeanor" as suggesting he arrived at the neighbor's apartment with the objective of extracting revenge on J.W. (See *People v. Lunafelix* (1985) 34 Cal.4th 614, 102 ["[T]he law does not require that a[n] [attempted] first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient."].)

Finally, as to the nature of the shooting, defendant did not fire one shot; rather, he unloaded his gun at J.W. who suffered shots to his arm, chest, back and abdominal areas. (*People v. Harris* (2008) 43 Cal.4th 1269, 1287 [holding substantial evidence of premeditation and deliberation existed because the "defendant was armed with a knife and stabbed [victim] without provocation directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart."].)

Notwithstanding the above, defendant contends the evidence shows that he acted with "an actual belief that he needed to defend himself from imminent great bodily injury or death, specifically that [J.W.] still had a gun and was going to shoot him again."

Alternatively, he asserts there is substantial evidence that he acted in the heat of passion in response to provocation—J.W. hitting him (defendant) on the head with a pole. We conclude there is no evidence to support any circumstance that would have permitted defendant to use deadly force against J.W.

It is uncontroverted that J.W. was the initial aggressor; however, he retreated, left defendant's apartment, and went to the neighbor's apartment. In response to J.W.'s attack, defendant did not lock the door to his apartment and call the police. Rather, he pursued J.W. outside of his (defendant's) apartment. As we previously stated, after confirming J.W.'s location, defendant went back inside his apartment, retrieved his other gun, ran back outside, confronted J.W., and fired shots until the gun was empty because he "gotta try to kill him back or something." When asked why he did not shut and lock his door and call the police, defendant replied, ""But I didn't start this. I didn't initiate it." He justified his act of chasing down J.W. by pointing out that "cops kill people for less." Based on this evidence, the jury reasonably could infer that defendant was no longer acting under the fear of imminent death/bodily injury or under the heat of passion, but for revenge or punishment. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [passion for revenge will not reduce murder to manslaughter].)

Since substantial evidence exists to support the crime of attempted murder, the trial court properly denied defendant's section 1118.1 motion for judgment of acquittal and allowed the matter to go to the jury.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

MILLER

J.


FIELDS

J.